**ALUMINUM COMPANY OF AMERICA, a Pennsylvania Corporation, Plaintiff,**

v.

**ESSEX GROUP, INC., a Michigan Corporation, Defendant.**

Civ. A. No. 78–598.

United States District Court, W. D. Pennsylvania.

April 7, 1980.

---

Frank L. Seamans, John H. Morgan, Richard W. Gladstone, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for plaintiff.

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

TEITELBAUM, District Judge.

Plaintiff, Aluminum Company of America (ALCOA), brought the instant action against defendant, Essex Group, Inc. (Essex), in three counts. The first count requests the Court to reform or equitably adjust an agreement entitled the Molten Metal Agreement entered into between AL-COA and Essex. The second count alleges that the Molten Metal Agreement was modified by oral amendment and that Essex has breached the amended agreement. The second count seeks a declaratory judgment that the alleged breach by Essex excuses ALCOA's further performance and seeks as well an award of damages caused by the alleged breach of Essex. The third count asks for a declaratory judgment that AL-COA's prior notice of termination of the Molten Metal Agreement was proper or, in the alternative, that ALCOA may terminate the Molten Metal Agreement if it be determined by this Court to be a contract for the sale of goods. Essex denies all of ALCOA's material allegations. Essex further counterclaims that ALCOA is liable to it for damages based on ALCOA's failure to deliver to Essex the amounts of molten metal ALCOA is contractually obligated to deliver under the Molten Metal Agreement and seeks entry of an order specifically enforcing its right to receive molten aluminum from ALCOA in the amounts requested.

Jurisdiction is based upon diversity of citizenship and amount in controversy and is one of the few issues in the case *sub judice* not in dispute.

In 1966 Essex made a policy decision to expand its participation in the manufacture

of aluminum wire products. Thus, beginning in the spring of 1967, ALCOA and Essex negotiated with each other for the purpose of reaching an agreement whereby ALCOA would supply Essex with its long-term needs for aluminum that Essex could use in its manufacturing operations.

By December 26, 1967 the parties had entered into what they designated as a toll conversion service contract known as the Molten Metal Agreement under which Essex would supply ALCOA with alumina which ALCOA would convert by a smelting process into molten aluminum. Under the terms of the Molten Metal Agreement, Essex delivers alumina to ALCOA which ALCOA smelts (or toll converts) into molten aluminum at its Warrick, Indiana, smelting facility. Essex then picks up the molten aluminum for further processing.

The price provisions of the contract contained an escalation formula which indicates that $.03 per pound of the original price escalates in accordance with changes in the Wholesale Price Index–Industrial Commodities (WPI) and $.03 per pound escalates in accordance with an index based on the average hourly labor rates paid to ALCOA employees at the Warrick plant. The portion of the pricing formula which is in issue in this case under counts one and two is the production charge which is escalated by the WPI. ALCOA contends that this charge was intended by the parties to reflect actual changes in the cost of the non–labor items utilized by ALCOA in the production of aluminum from alumina at its Warrick, Indiana smelting plant. In count one of this suit ALCOA asserts that the WPI used in the Molten Metal Agreement was in fact incapable of reasonably reflecting changes in the non–labor costs at ALCOA's Warrick, Indiana smelting plant and has in fact failed to so reflect such changes.

It is ALCOA's contention in count one of its complaint that the shared objectives of the parties with respect to the use of the WPI have been completely and totally frustrated, that both ALCOA and Essex made a mutual mistake of fact in agreeing to use the WPI to escalate non–labor costs at Warrick. ALCOA is seeking reformation or equitable adjustment of the Molten Metal Agreement so that pursuant to count one of its complaint, the pricing formula with respect to the non–labor portion of the production charge will be changed to eliminate the WPI and substitute the actual costs incurred by ALCOA for the non–labor items used at its Warrick, Indiana smelting plant. Essex opposes relief under count one contending that: 1) ALCOA cannot obtain reformation of the Molten Metal Agreement on the grounds of mutual mistake since ALCOA has failed to establish any antecedent agreement on pricing not expressed in the Molten Metal Agreement; 2) ALCOA assumed the risk that its prediction as to future costs would be incorrect; 3) ALCOA has failed to prove that enforcement of the Molten Metal Agreement would be unconscionable.

ALCOA alleges in the second count of its complaint that when it became evident that the WPI was not accomplishing the objectives of the parties under the Molten Metal Agreement, discussions were begun between ALCOA and Essex which culminated in a meeting held between Mr. Krome George, Chief Executive Officer of ALCOA, and others of ALCOA and Mr. Paul O'Malley, President of Essex, on July 21, 1975. At that time, Mr. George and Mr. O'Malley allegedly orally agreed to reform the Molten Metal Agreement to reflect the original objectives of the parties. The oral agreement allegedly replaced the WPI with the actual costs incurred by ALCOA. Essex denies entering into the alleged oral agreement and has accordingly refused to perform consistent with its terms. In its second count, ALCOA requests that declaratory judgment be entered whereby Essex's breach of its alleged oral agreement to reform the Molten Metal Agreement be declared sufficient grounds to excuse any further performance by ALCOA of that Agreement. In addition, ALCOA seeks that it be awarded damages in excess of

$11,900,000 accruing to the date of judgment resulting from Essex's breach, plus interests and costs.

ALCOA asks in its third count that it be excused from further performance of the Molten Metal Agreement. ALCOA alleges that its performance is excused by a clause which is contained in a document referred to as the December 27, 1967 Letter Agreement (the Side Letter Agreement). That clause provides that ALCOA and Essex, acting in good faith, entered into the Molten Metal Agreement with the understanding that it was a contract for the furnishing of services by ALCOA to Essex. The clause further provides that in the event a final decision of a court construed the Molten Metal Agreement as a contract for the sale of goods it could be terminated by either party. The Side Letter Agreement was a product of concern that an admittedly preferential price to Essex would threaten a violation of the Robinson–Patman Act if the various transactions could be lumped together and considered to be in substance the sale of aluminum rather than what appears as a matter of form, the sale of services.

ALCOA argues it should be permitted to terminate the Molten Metal Agreement under the terms of the Side Letter Agreement. ALCOA urges that this Court should determine whether the Molten Metal Agreement is a contract for the sale of goods.

As previously indicated, Essex has filed a counterclaim to the ALCOA complaint. The original counterclaim of Essex contends that under the terms of the Molten Metal Agreement as implemented during the years 1977, 1978 and the first six months of 1979, ALCOA has, on numerous occasions, breached the Molten Metal Agreement by improperly failing to deliver the amounts of molten aluminum required by the contract. This first counterclaim asks that Essex be awarded damages in an amount as to fully compensate it for the failure of ALCOA to deliver molten aluminum in accordance with the terms of the Molten Metal Agreement.

The amended counterclaim of Essex arises as a result of a letter dated June 4, 1979, in which ALCOA informed Essex that it was reducing by 15% the amount of its deliveries of molten aluminum requested by Essex. ALCOA claims to have this authority under the terms of the Molten Metal Agreement. Essex contends that ALCOA does not have any such authority and its amended counterclaim additionally asks for an order enforcing the Molten Metal Agreement and awarding damages accordingly.

Simply put, if possible, ALCOA seeks relief from this Court in a three count complaint, while Essex opposes ALCOA's requests and itself seeks relief via a counterclaim.

The Court finds, based upon consideration of all the evidence, that ALCOA is entitled to reformation of the Molten Metal Agreement. At the same time, ALCOA's requests for relief in counts two and three are denied as is the request for relief by Essex in its counterclaim.

## COUNT ONE

ALCOA's first count seeks an equitable modification of the contract price for its services. The pleadings, arguments and briefs frame the issue in several forms. ALCOA seeks reformation or modification of the price on the basis of mutual mistake of fact, unilateral mistake of fact, unconscionability, frustration of purpose, and commercial impracticability.

### A.

The facts pertinent to count one are few and simple. In 1967 ALCOA and Essex entered into a written contract in which ALCOA promised to convert specified amounts of alumina supplied by Essex into aluminum for Essex. The service is to be performed at the ALCOA works at Warrick, Indiana. The contract is to run until the end of 1983. Essex has the option to extend it until the end of 1988. The price

for each pound of aluminum converted is calculated by a complex formula which includes three variable components based on specific indices. The initial contract price was set at fifteen cents per pound, computed as follows:

A. Demand Charge      $0.05/lb.
B. Production Charge
   (i) Fixed component     .04/lb.
   (ii) Non-labor production cost component    .03/lb.
   (iii) Labor production cost component    .03/lb.
Total initial charge      $0.15/lb.

The demand charge is to vary from its initial base in direct proportion to periodic changes in the Engineering News Record Construction Cost–20 Cities Average Index published in the Engineering News Record. The Non–labor Production Cost Component is to vary from its initial base in direct proportion to periodic changes in the Wholesale Price Index–Industrial Commodities (WPI–IC) published by the Bureau of Labor Statistics of the United States Department of Labor. The Labor Production Cost Component is to vary from its initial base in direct proportion to periodic changes in ALCOA's average hourly labor cost at the Warrick, Indiana works. The adjusted price is subject to an over–all "cap" price of 65% of the price of a specified type of aluminum sold on specified terms, as published in a trade journal, American Metal Market.

The indexing system was evolved by ALCOA with the aid of the eminent economist Alan Greenspan. ALCOA examined the non–labor production cost component to assure that the WPI–IC had not tended to deviate markedly from their non–labor cost experience in the years before the contract was executed. Essex agreed to the contract including the index provisions after an examination of the past record of the indices revealed an acceptable pattern of stability.

ALCOA sought, by the indexed price agreement, to achieve a stable net income of about 4¢ per pound of aluminum converted. This net income represented ALCOA's return (i) on its substantial capital investment devoted to the performance of the contracted services, (ii) on its management, and (iii) on the risks of short–falls or losses it undertook over an extended period. The fact that the non–labor production cost component of ALCOA's costs was priced according to a surrogate, objective index opened the door to a foreseeable fluctuation of ALCOA's return due to deviations between ALCOA's costs and the performance of the WPI–IC. The range of foreseeable deviation was roughly three cents per pound. That is to say that in some years ALCOA's return might foreseeably (and did, in fact) rise to seven cents per pound, while in other years it might foreseeably (and did, in fact) fall to about one cent per pound. See Table I.

Essex sought to assure itself of a long term supply of aluminum at a favorable price. Essex intended to and did manufacture a new line of aluminum wire products. The long term supply of aluminum was important to assure Essex of the steady use of its expensive machinery. A steady production stream was vital to preserve the market position it sought to establish. The favorable price was important to allow Essex to compete with firms like ALCOA which produced the aluminum and manufactured aluminum wire products in an efficient, integrated operation.

In the early years of the contract, the price formula yielded prices related, within the foreseeable range of deviation, to ALCOA's cost figures. Beginning in 1973, OPEC actions to increase oil prices and unanticipated pollution control costs greatly increased ALCOA's electricity costs. Electric power is the principal non–labor cost factor in aluminum conversion, and the electric power rates rose much more rapidly than did the WPI–IC. As a result, ALCOA's production costs rose greatly and unforeseeably beyond the indexed increase in the contract price. Table I illustrates the relation between the WPI–IC and ALCOA's costs over the years of the contract, and the resulting consequences for ALCOA:

TABLE I

| YEAR | BASE WPI-IC [1] | WARRICK NON-LABOR PRODUCTION COSTS [2] PER POUND | | PROFIT/ LOSS PER LB. | POUNDS DELIVERED | PROFIT/ LOSS |
|------|-----|-----|-----|-----|-----|-----|
| | | ¢ | % | | | |
| 1968 | 102.5 | 4.371 | 110.5 | 5.799 | 25,300,000 | $1,467,147 |
| 1969 | 106.0 | 4.010 | 101.4 | 7.097 | 54,694,317 | 3,881,656 |
| 1970 | 110.0 | 4.397 | 111.1 | 6.517 | 84,370,265 | 5,498,410 |
| 1971 | 114.1 | 5.215 | 131.8 | 5.367 | 65,522,280 | 3,516,581 |
| 1972 | 117.9 | 5.309 | 134.2 | 5.721 | ·83,128,209 | 4,755,765 |
| 1973 | 125.9 | 5.819 | 147.1 | 4.535 | 82,201,940 | 3,727,857 |
| 1974 | 153.8 | 9.009 | 227.1 | 2.070 | 86,234,310 | 1,785,050 |
| 1975 | 171.5 | 11,450 | 289.4 | .189 | 76,688,530 | 144,941 |
| 1976 | 182.4 | 13.948 | 352.6 | ( .301)[3] | 83,363,502 | 250,924 |
| 1977 | 195.1 | 17.806 | 450.1 | (4.725)[3] | 72,289,722 | (3,415,689) |
| 1978 | 209.4 | 22.717 | 574.2 | (10.484)[3] | 82,235,337 | (8,620,504) |

[1] The contract calls for a recomputation of the WPI-IC, so that the "Base Wholesale Price Index" = 100 in 1967.

[2] Warrick Non-Labor Production Costs 1967 - 100%.

[3] The profit (loss) shown in years 1976 through 1978 was affected by a temporary surcharge agreement. Without the temporary surcharge the loss in cents per pound would have been as follows: 1976 (1.699); 1977 (6.725); 1978 (10.984). The loss each year would have been as follows: 1976 ($1,416,346); 1977 ($4,861,484); 1978 ($9,031,631).

During the most recent years, the market price of aluminum has increased even faster than the production costs. At the trial AL-COA introduced the deposition of Mr. Wilfred Jones, an Essex employee whose duties included the sale of surplus metal. Mr. Jones stated that Essex had resold some millions of pounds of aluminum which ALCOA had refined. The cost of the aluminum to Essex (including the purchase price of the alumina and its transportation) was 36.35 cents per pound around June of 1979. Mr. Jones further stated that the resale price in June 1979 at one cent per pound under the market, was 73.313 cents per pound, yielding Essex a gross profit of 37.043 cents per pound. This margin of profit shows the tremendous advantage Essex enjoys under the contract as it is written and as both parties have performed it. A significant fraction of Essex's advantage is directly attributable to the corresponding out of pocket losses ALCOA suffers. AL-COA has sufficiently shown that without judicial relief or economic changes which are not presently foreseeable, it stands to lose in excess of $75,000,000 out of pocket, during the remaining term of the contract.

B.

ALCOA's Warrick Works, located in Indiana, are the designated source of supply. The Essex plant, where the bulk of the aluminum is used, is also located in Indiana. Essex takes delivery at the Warrick Works.

█ The contract declares "This Agreement shall be governed and interpreted in accordance with the laws of the State of Indiana." The parties surely have sufficient contacts with the State of Indiana that Pennsylvania courts would enforce their agreement respecting the application of Indiana law. Restatement 2d Conflict of Laws § 187; *cf.* 13 Pa.C.S.A. § 1105(1) (U.C.C.). This Court must enforce it as well. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

█ This case presents many issues which are governed by common law princi-

ples. Most fall within the interstices of the reported decisions of Indiana courts. Some touch principles announced in hoary Indiana decisions. Where the Indiana law remains undeclared, or where the declaration is far from current, the obligation of this Court is to discern the most probable state of current Indiana law for "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); see *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886, 893–94 (1967); *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657 (3rd Cir. 1980). In connection with these observations, the Court notes that the appellate courts of Indiana appear to join in the habits of thought and in the assessments of policy which have lately prevailed in most of the fine courts in this nation. The Indiana courts have joined the throng of state courts in (i) declaring that residential landlords are bound by an implied warranty of habitability. *Old Town Development v. Langford,* 349 N.E.2d 744 (Ind.App.1976); (ii) adopting the rule of strict products liability from the Restatement 2d of Torts § 402A, *Perfection Paint & Color Co. v. Konduris,* 258 N.E.2d 681 (Ind.App.1970); (iii) adopting the increasingly prevalent view that harsh or unconscionable provisions in contracts of adhesion may be refused enforcement, *Weaver v. American Oil Co.,* 276 N.E.2d 144 (Ind.1971).

### C.

■ ALCOA initially argues that it is entitled to relief on the theory of mutual mistake. ALCOA contends that both parties were mistaken in their estimate of the suitability of the WPI–IC as an objective index of ALCOA's non–labor production costs, and that their mistake is legally sufficient to warrant modification or avoidance

1. This argument is discussed in section E.

2. This language appears in the final form of the Restatement. A copy of the master draft was

of ALCOA's promise. Essex appropriately raised several defenses to these claims. Essex first argues that the asserted mistake is legally insufficient because it is essentially a mistake as to future economic events rather than a mistake of fact. Essex next argues that ALCOA assumed or bore the risk of the mistake. Essex finally argues that the requested remedy of reformation is not available under Indiana law.[1]

The late Professor Corbin wrote the best modern analysis of the doctrine of mutual mistake. Corbin took pains to show the great number and variety of factors which must be considered in resolving claims for relief founded on the doctrine of mistake, and to show the inappropriateness of any single verbal rule to govern the decision of mistake cases. Corbin on Contracts § 597 at 582–83 (1960).

The present case involves a claimed mistake in the price indexing formula. This is clearly a mistake concerning a factor affecting the value of the agreed exchange. Of such mistakes Corbin concluded that the law must consider the character of the risks assumed by the parties. Id. at § 605. He further concluded:

In these cases, the decision involves a judgment as to the materiality of the alleged factor, and as to whether the parties made a definite assumption that it existed and made their agreement in the belief that there was *no risk* with respect to it. Opinions are almost sure to differ on both of these matters, so that decisions must be, or appear to be, conflicting. The court's judgment on each of them is a judgment on a matter of fact, not a judgment as to law. No rule of thumb should be constructed for cases of this kind. 3 Corbin on Contracts § 605 at p. 643 (1960).

The new Restatement 2d of Contracts follows a similar approach. After defining "mistake" as "a belief not in accord with the facts," § 293,[2] the Restatement declares:

presented to the court by the Reporter, Professor E. Allen Farnsworth, as Appendix B to his oral brief for ALCOA. The circulated Tentative Draft No. 10 used a different word, "*existing*

## § 294. WHEN MISTAKE OF BOTH PARTIES MAKES A CONTRACT VOIDABLE.

(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 296.

(2) In determining whether this mistake has a material affect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.[3]

Both Professor Corbin and the Restatement emphasize the limited place of the doctrine of mistake in the law of contracts. They, along with most modern commentators, emphasize the importance of contracts as devices to allocate the risks of life's uncertainties, particularly economic uncertainties. Where parties to a contract deliberately and expressly undertake to allocate the risk of loss attendant on those uncertainties between themselves or where they enter a contract of a customary kind which by common understanding, sense, and legal doctrine has the affect of allocating such risks, the commentators and the opinions are agreed that there is little room for judicial relief from resulting losses. Corbin on Contracts § 598 and authorities there cited. The new Restatement agrees, § 296. This is, in part, the function of the doctrine of assumption of the risk as a limitation of the doctrine of mistake. Whether ALCOA assumed the risk it seeks relief from is at issue in this case. The doctrine of assumption of the risk is therefore considered below. The important point to note here is that the doctrine of assumption of the risk

is not the only risk allocating limitation on the doctrine of mistake. Other important risk allocating limitations are inherent in the doctrine of mistake itself. They find expression in the cases and treatises in declarations that there has been no mistake, or no legally cognizable mistake, or a mistake of the wrong sort.

ALCOA claims that there was a mutual mistake about the suitability of the WPI–IC as an index to accomplish the purposes of the parties. Essex replies that the mistake, if any, was not a mistake of *fact*, but it was rather a mistake in predicting future economic conditions. Essex asserts that such a mistake does not justify legal relief for ALCOA. The conflicting claims require the Court to resolve three questions: (1) Was the mistake one of "fact" as the cases and commentators use that word? (2) If so, was it of the sort of fact for which relief could be granted? (3) If the mistake was not one of "fact", is relief necessarily foreclosed?

The initial question requires the characterization, as a matter of fact rather than of law, of the claimed mistake. The cases and commentaries contain useful thoughts and analagous problems which aid in this characterization. But the characterization is itself a question of fact. That it may have ultimate legal significance, and that it requires the exercise of judgment does not distinguish this determination from other determinations of fact. The distinction between questions of law and questions of fact is old. Its resolution is often doubtful. No simple and mechanical verbal formula can capture the distinction and resolve the hard cases. Factors affecting the characterization of a question include its suitability for jury or other fact finder determination and its analytical separability from the final determination of legal consequences.[4]

---

facts." The possible significance of this change in the definition of "mistake" is considered below.

**3.** The quoted language in subsection (2), and in some of the Comments which will be quoted contains variations from the published lan-

guage. See n. 6. Those variations are not material to the decision of this case.

**4.** In this connection the court quotes the Restatement 2d § 293 Comment:

The separation of fact from things which are not fact—opinion, prediction, desire, and the like—is principally a question of common sense or epistemology rather than of law, even when the separation must be done by courts. So it is here. ALCOA calls the mistaken assumption that the index was suitable a factual assumption. Essex calls it a prediction. This is a dispute of facts, not law. Its resolution will affect the decision of this case as factual determinations usually do. The law must be applied to it to yield a result. Neither is this question beyond the usual function and capacity of a jury or other fact finder.

The first restatement of Contracts notes, and the published Tentative Draft No. 10 of the Restatement Second stresses, the distinction between "existing fact" and prediction. See Restatement of Contracts § 502, comment a; Restatement 2d of Contracts § 293. The approved final form of § 293 modifies the emphasis by deleting the word "existing". The Reporter, Professor Farnsworth of the Columbia University School of Law, related the circumstances of that change to the Court when he appeared on behalf of ALCOA.

Q Professor Farnsworth, is there any expression or trend expressed in the new sections on mistake that you have been describing that provide any help in trying to determine the age—old problem of what is an existing fact?

A There has been a change, I don't know how much help it offers. Let me simply tell you the history of it.

In 1975 in May at the annual meeting, the material on mistake was presented, and it led off with a Section 293 which defined the mistake as a belief that is not in accordance with existing facts.

That section was I think not the subject of any discussion, at least not the subject of any discussion involving the word 'existing' in that year. The following year there was presented a chapter that is not in the documents that are here

"Mistake alone, in the sense in which the word is used here, has no legal consequences. The legal consequences of mistake in connec-

in court, but a chapter dealing with, among other things, misrepresentation, and in defining a misrepresentation, there was also a comparable phrase that what you had to misrepresent was an existing fact. At that meeting, there was one speaker who thought that the word 'existing' was not desirable and should be deleted. I confess I have re-read the speaker's statement or the transcript of it, and I can provide it if you want it, but I don't find it clear enough that it was helpful to me. I did not think that was a desirable change. I think partly because the preceding year when we had considered 'mistake,' the Institute had approved 'existing facts,' and I felt rather bound by that earlier decision.

At this point I lose any record in the transcript. My clear recollection is that following the discussion of misrepresentation, a number of people came up to me and later saw me in the hallway and said that they agreed with the speaker that 'existing' should be dropped.

It would be fair to say that there were probably as many reasons for dropping it given to me as there were people who had advanced the opinion.

I would suppose at the end at least a dozen people had said they didn't like 'existing,' and nobody had defended it. *The reporter has the authority to change even the black letter when it is a matter of style, and since I did not bring it back to the Institute for a vote as a matter of substance, I think one would have to say that any change made was considered by the reporter to be a matter of style.*

In any event, in response to the small but unanimous body of opinion that didn't like 'existing,' it was deleted in the draft that I finally sent off to the editor and it now reads 'Belief that is not in accord with the facts.'

*I think that there is in the comment still a statement with respect to 'existing,' but the deletion from the black let-*

tion with the creation of contractual liability are determined by the rule stated in the rest of this chapter."

*ter is at least a change that perhaps permits more flexibility with respect to the line between what is an existing fact or what is a fact and what is a pure presumption which is an extremely difficult line to draw in both cases.*

Testimony of E. Allan Farnsworth 20–22 (Emphasis added).

The Comment Professor Farnsworth mentioned declares:

[T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here.

Corbin and Williston agree in passing, though their analysis emphasizes the various subjects of mistake and the circumstances which influence risk allocation. *Cf.* Corbin on Contracts § 598; Williston on Contracts § 1541 at 67 (3rd ed. [Jaeger] 1970). Both cite cases declaring erroneous prediction to be beyond the reach of the doctrine of mutual mistake. *See* Corbin on Contracts § 598; Williston on Contracts § 1543A.

The Court finds the parties' mistake in this case to be one of fact rather than one of simple prediction of future events. Plainly the mistake is not wholly isolated from predictions of the future or from the searching illuminations of painful hindsight. But this is not the legal test. At the time the contract was made both parties were aware that the future was unknown, and their agreed contract was intended to bind them for many years to come. Both knew that Essex sought an objective pricing formula and that ALCOA sought a formula which would cover its out of pocket costs over the years and which would yield it a return of around four cents a pound. Both parties to the contract carefully examined the past performance of the WPI–IC before agreeing to its use. The testimony was clear that each assumed the Index was adequate to fulfill its purpose. This mistaken assumption was essentially a present actuarial error.

The parties took pains to avoid the full risk of future economic changes when they embarked on a twenty–one year contract involving services worth hundreds of millions of dollars. To this end they employed a customary business risk limiting device–price indexing--with more than customary sophistication and care. They chose not a single index formula but a complex one with three separate indices. Their care to limit the risk of the future distinguishes this case from cases like *Leasco Corporation v. Taussig*, 473 F.2d 777 (2nd Cir. 1972). In *Leasco* the plaintiff corporation contracted to sell to Taussig a subsidiary which engaged in civil engineering and consulting. Taussig was, at the time, the vice–president of the subsidiary. The parties fixed the sales price by capitalizing the anticipated $200,000 earnings of the subsidiary in the year of the sale. Both parties knew that the subsidiary's earnings were volatile. "The civil engineering business is personalized, highly technical, and extremely risky." *Id.* at 781. But the parties made no provision to limit their risk. In fact the projected $200,000 earnings turned into a $12,000 loss due to a design error in a construction project. The court held that this loss did not make the contract voidable: "[W]e hold that there was no mutual mistake. Both Taussig and Leasco may have hoped, but surely could not have been certain, that [the subsidiary] would earn $200,000 in fiscal 1971.... Neither party could safely assume the projected earnings would be realized." *Id.* The "fact" which led to the dispute was a prediction. The court characterized the situation as one where the parties realized there was doubt about an important fact and assumed, or more accurately placed on the purchaser, the risk of its existence. See Restatement of Contracts § 502, comment f.

The *Taussig* decision rested on two legs: the absence of a mistake of "fact" and the assumption of the risk of future uncertainties. The decision was plainly correct. The parties bottomed their agreement on a naked prediction without the protection of conditions or limitations. The only protection for the parties lay in practical matters.

Both were well familiar with the business. And the contract was a short term one for the outright sale of the business. In the short term the parties might think they could sensibly risk uncertainties without specific contractual limits. Having made no attempt to limit future uncertainties, the disappointed purchaser could point to no fact which existed when the contract was made which would justify an award of judicial relief.

The contrast between *Taussig* and the present case is striking. Here the practical necessities of the very long term service contract demanded an agreed risk limiting device. Both parties understood this and adopted one. The capacity of their selected device to achieve the known purposes of the parties was not simply a matter of acknowledged uncertainty like the *Taussig* prediction. It was more in the nature of an actuarial prediction of the outside limits of variation in the relation between two variable figures—the WPI–IC and the non–labor production costs of ALCOA. Its capacity to work as the parties expected it to work was a matter of fact, existing at the time they made the contract.

This crucial fact was not known, and was scarcely knowable when the contract was made.[5] But this does not alter its status as an existing fact. The law of mistake has not distinguished between facts which are unknown but presently knowable, *e. g. Raffles v. Wichelhaus,* 2 H. & C. 906 (1864), and facts which presently exist but are unknowable, *e. g. Sherwood v. Walker,* 66 Mich. 568, 33 N.W. 919 (1887). Relief has been granted for mistakes of both kinds.

To conclude that the parties contracted upon a mistake of fact does not, by itself, justify an award of judicial relief to AL-COA. Relief can only follow if the mistake was mutual, if it related to a basic assumption underlying the contract, and if it caused a severe imbalance in the agreed exchange.

The doctrine of mistake has long distinguished claims of mutual mistake from claims of unilateral mistake. Corbin on Contracts § 608. The standards for judicial relief are higher where the proven mistake is unilateral than where it is mutual. Compare, *e. g.* Restatement 2d of Contracts § 294 with § 295.

Essex asserts that ALCOA's mistake was unilateral. Mr. O'Malley, Chairman of the Board of Essex Corporation, testified at trial that he had no particular concern for ALCOA's well–being and that in the negotiations of the contract he sought only Essex's best interests. Essex claims this testimony tends to rebut any possible mutual mistake of fact between the parties. The Court disagrees.

The cases clearly establish that mutual mistake lies in error concerning mutually understood material facts. *Leasco Corp. v. Taussig, supra; Baumann v. Florance,* 267 App.Div. 113, 114, 44 N.Y.S.2d 706 (3d Dept. 1943). The law of mutual mistake is not addressed primarily to motivation or to desire to have a good bargain, such as that credibly testified to by Mr. O'Malley. As Mr. O'Malley struck the bargain for Essex, he understood the function of the Wholesale Price Index, as part of the pricing formula, to be the protection of ALCOA from foreseeable economic fluctuations. He further had every reason to believe that the formula was selected on the factual prediction that it would, within tolerable limits, serve its purpose. While he did not share the motive to protect ALCOA, he understood the functional purposes of the agreement. He therefore shared this mistake of fact. And his mistake was Essex's. The Court recognizes that Mr. O'Malley and Essex would cheerfully live with the benefit of their mistake, but the law provides otherwise. As a matter of law Mr. O'Malley's testimony of Essex's indifference concerning ALCOA's motivation for the use of the

---

5. Clear hindsight suggests the flaw might have been anticipated and cured by a "floor" resembling the 65% "cap" that Essex wròte into the price formula. To the extent this possibility might be thought material to the case, the Court specifically finds that when the contract was made, even people of exceptional prudence and foresight would not have anticipated a need for this additional limitation to achieve the purpose of the parties.

Wholesale Price Index as a gauge for tracking non–labor costs is immaterial.

Is it enough that one party is indifferent to avoid a mutual mistake? The Court thinks not. This situation resembles that in *Sherwood v. Walker, supra*, the celebrated case of Rose of Aberlone. There the owner of a prize breeding cow sold her for slaughter at the going rate for good slaughter cattle. The owner had unsuccessfully tried to breed her and had erroneously concluded she was sterile. In fact she was pregnant at the time of the sale and she was much more valuable for breeding than for slaughter. There as here, the buyer was indifferent to the unknown fact; he would have been pleased to keep the unexpected profit. But he understood the bargain rested on a presumed state of facts. The court let the seller avoid the contract because of mutual mistake of fact.

In *Sherwood*, the buyer didn't know the highly pedigreed Rose was with calf. He probably could not have discovered it at the time of the sale with due diligence. Here the parties could not possibly have known of the sudden inability of the Wholesale Price Index to reflect ALCOA's non–labor costs. If, over the previous twenty years, the Wholesale Price Index had tracked, within a 5% variation, pertinent costs to ALCOA, a 500% variation of costs to Index must be deemed to be unforeseeable, within any meaningful sense of the word.

Essex has not seriously argued that the mistake does not relate to an assumption which is basic to the contract. The relation is clear. The assumed capacity of the price formula in a long term service contract to protect against vast windfall profits to one party and vast windfall losses to the other is so clearly basic to the agreement as to repel dispute. While the cases often assert that a mistake as to price or as to future market conditions will not justify relief, this is not because price assumptions are not basic to the contracts. Instead, relief is denied because the parties allocated the risk of present price uncertainties or of uncertain future market values by their contract. Where a "price mistake" derives from a mistake about the nature or quantity of an object sold, the courts have allowed a remedy; they have found no contractual allocation of that sort of risk of price error. Indiana cases hold that where land is sold as a tract for a set price, and it later appears that there was a material error in the parties' estimate of the quantity of land conveyed, the court will correct the error by adjusting the price, *McMahan v. Terkhorn*, 67 Ind.App. 501, 116 N.E. 327 (1917), or by allowing rescission, *Earl v. VaNatta*, 29 Ind. App. 532, 64 N.E. 901 (1902). See Corbin on Contracts §§ 604–05. Similarly many cases allow relief from unilateral price errors by construction contractors. An Indiana decision reached this result. *Board of School Comm'rs v. Bender*, 36 Ind.App. 164, 72 N.E. 154 (1904). See Corbin on Contracts § 609. Restatement 2d of Contracts § 295, comment a. These cases demonstrate that price assumptions may be basic to the contract.

Essex concedes that the result of the mistake has a material effect on the contract and that it has produced a severe imbalance in the bargain. See Restatement 2d of Contracts § 294, comment c. The most that Essex argues is this: ALCOA has not proved that enforcement of the contract would be *unconscionable*. Essex correctly points out that at the time of the trial ALCOA had shown a net profit of $9 million on the contract. Essex further argues that ALCOA has failed to prove that it ever will lose money on the contract, and that such proof would require expert testimony concerning future economic values and costs. These arguments are insufficient.

The evidence shows that during the last three years ALCOA has suffered increasingly large out of pocket losses.[6] If the contract were to expire today that net prof-

---

**6.** The Court recognizes that ALCOA has suffered even larger losses of potential profits which it might have earned, but for the contract, in the strong aluminum market in recent years. Essex, rather than ALCOA, has enjoyed those profits. But their existence is immaterial to the questions raised in this case.

it of $9 million would raise doubts concerning the materiality of the parties' mistake. But even on that supposition, the court would find the mistake to be material because it would leave ALCOA dramatically short of the minimum return of one cent per pound which the parties had contemplated.

But the contract will not expire today. Essex has the power to keep it in force until 1988. The Court rejects Essex's objection to the absence of expert testimony concerning future costs and prices. The objection is essentially based on the traditional refusal of courts to award speculative damages. But Essex presses the argument too far. The law often requires courts to make awards to redress anticipated losses. The reports are filled with tort and contract cases where such awards are made without the benefit of expert testimony concerning future economic trends. Awards are commonly denied because they are too speculative where there is a claim for lost future profits and there is insufficient evidence of present profits to form a basis for protecting future profits.

Similarly the courts often decline to speculate concerning future economic trends in calculating awards for lost future earnings. Many states refuse to consider any possibility of future inflation in calculating such awards despite the presence of expert testimony and the teachings of common experience. Compare *Havens v. Tonner*, 243 Pa. Super. 371, 365 A.2d 1271 (1976) and *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 768 (3rd Cir. 1977), with *Feldman v. Allegheny Airlines*, 382 F.Supp. 1271 (D.Conn.1974), aff'd in part, rev'd in part, 524 F.2d 384 (2nd Cir. 1975). This demonstrates the law's healthy

skepticism concerning the reliability of expert predictions of economic trends. Where future predictions are necessary, the law commonly accepts and applies a prediction that the future economy will be much like the present (except that inflation will cease). Since some prediction of the future is inescapable in this case, that commonly accepted one will necessarily apply.[7] On that prediction, ALCOA has proved that over the entire life of the contract it will lose, out of pocket, in excess of $60 million, and the whole of this loss will be matched by an equal windfall profit to Essex.[8] This proof clearly establishes that the mistake had the required material effect on the agreed exchange. Indeed, if this case required a determination of the conscionability of enforcing this contract in the current circumstances, the Court would not hesitate to hold it unconscionable.

Essex next argues that ALCOA may not be relieved of the consequences of the mistake because it assumed or bore the risk of the market. Essex relies on both Restatements and on a variety of cases fairly typified by *Leasco Corp. v. Taussig, supra; McNamara Const. of Manitoba Ltd. v. United States*, 509 F.2d 1166 (Ct.Cl.1963), and *Flippin Materials Co. v. United States*, 312 F.2d 408 (Ct.Cl.1963). *McNamara Construction* involved a fixed price construction contract which was upset by extensive labor strife. The Court of Claims denied the contractor relief from its extra costs, holding, *inter alia*, that the contractor had been aware of the risk of labor trouble when it entered the contract; that the contract expressly provided for delay caused by strikes; and that in the absence of some further

---

**7.** Since the effect of this decision is to modify the contract but to keep it in force, both parties may be adequately protected against severe and surprising economic developments. Each continues to have recourse to the courts.

**8.** The equivalence of ALCOA's loss and Essex's gain may distinguish this case from the concededly more difficult "Suez cases." *Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C.Cir.1966); *American Trading and Production Corp. v. Shell International Marine*, 453 F.2d 939 (2nd Cir. 1972); *Glidden Co. v. Hellen-*

*ic Lines*, 275 F.2d 253 (2nd Cir. 1960); *Ocean Tramp Tankers Corp. v. V/U Sorracht (The Eugenia)*, [1964] 1 All E.R. 161 (C.A.1963). In those cases an unexpected closing of the canal materially increased the cost of performing the contract leaving the courts to determine the allocation of a loss not balanced by an equal profit. Those cases might also be distinguished in that they involved the doctrine of frustration of purpose rather than the doctrine of mistake. However, the similarity of these doctrines renders this distinction doubtful.

express provision the contractor bore the risk of the cost of strikes and labor cost increases. The court declared: "What we have in this case is a risk which is known to both parties and results from human inability to predict the future. The authorities are unanimous in distinguishing such risks from bona fide mutual mistakes of fact." *Id.* at 1168.

In *Flippin Materials Co. v. United States, supra,* the plaintiff sought relief from unexpected costs it suffered in a contract to quarry limestone from a mountain and to process it into aggregate. The costs derived from the presence of unexpected amounts of waste material at the quarry site. The Court of Claims held that the plaintiff could not claim relief on a mutual mistake theory because the contract clearly put the risk of unknown subsurface conditions on the plaintiff. The contract offer made the government's geological findings available to the bidders and it further provided:

### GC–2 SITE INVESTIGATION AND REPRESENTATIONS:

The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon . . . conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered . . . and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. *Id.* at 415.

The court declared that relief for mutual mistake is not available "if the contract puts the risk of such a mistake on the party asking reformation . . . or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change. . . ." *Id.*

The Restatements and these cases reveal four facets of risk assumption and risk allocation under the law of mistake. First, a party to a contract may expressly assume a risk. If a contractor agrees to purchase and to remove 114,000 cubic yards of fill from a designated tract for the landowner at a set price "regardless of subsurface soil and water conditions" the contractor assumes the risk that subsurface water may make the removal unexpectedly expensive.

Customary dealing in a trade or common understanding may lead a court to impose a risk on a party where the contract is silent. Often the result corresponds to the expectation of both parties, but this will not always be true. *See* Berman, Excuse for Nonperformance in the Light of Contract Practices in International Trade, 63 *Colum.L.Rev.* 1413, 1420-24 (1963). At times legal rules may form the basis for the inferred common understanding. Equity traditionally put the risk of casualty losses on the purchaser of land while the purchase contract remained executory. This allocation was derived from the doctrine of equitable conversion. "Equity regards as done that which ought to be done." The rule could always be modified by express agreement. It survives today · where it does survive [9] largely by reason of its acceptance as part of the common expectations of real estate traders and their advisors.

Third, where neither express words nor some particular common understanding or trade usage dictate a result, the court must allocate the risk in some reasoned way. Two examples from the Restatement 2d of Contracts § 296 illustrate the principle. A farmer who contracts to sell land may not escape the obligation if minerals are discovered which make the land more valuable. And in the case of the sale of fill stated above, if there is no express assumption of the risk of adverse conditions by the contractor, he may still bear the risk of losing his expected profits and suffering some out

---

9. Several states have modified it by adopting the Uniform Vender and Purchaser Risk Act.

of pocket losses if some of the fill lies beneath the water table. These cases rest on policies of high generality. Contracts are–generally–to be enforced. Land sales are–generally–to be treated as final.

Fourth, where parties enter a contract in a state of conscious ignorance of the facts, they are deemed to risk the burden of having the facts turn out to be adverse, within very broad limits. Each party takes a calculated gamble in such a contract. Because information is often troublesome or costly to obtain, the law does not seek to discourage such contracts. Thus if parties agree to sell and purchase a stone which both know may be glass or diamond at a price which in some way reflects their uncertainty, the contract is enforceable whether the stone is in fact glass or diamond. If, by contrast, the parties both mistakenly believe it to be glass, the case is said not to be one of conscious ignorance but one of mutual mistake. Consequently the vendor may void the contract.

In this case Essex raises two arguments. First, it asserts that ALCOA expressly or by fair implication assumed the risk that the WPI–IC would not keep up with ALCOA's non–labor production costs. Second, it asserts that the parties made a calculated gamble with full awareness that the future was uncertain, so the contract should be enforced despite the mutual mistake. Both arguments are correct within limits, and within those limits they affect the relief ALCOA may receive. Both arguments fail as complete defenses to ALCOA's claim.

Essex first asserts that ALCOA expressly or implicitly assumed the risk that the WPI–IC would not track ALCOA's non–labor production costs. Essex asserts that ALCOA drafted the index provision; that it did so on the basis of its superior knowledge of its cost experience at the Warrick Works; and that ALCOA's officials knew of the inherent risk that the index would not reflect cost changes. Essex emphasizes that, during the negotiation of the contract, it insisted on the inclusion of a protective "ceiling" on the indexed price of ALCOA's services at 65% of a specified published market price. Essex implies that ALCOA could have sought a corresponding "floor" provision to limit its risks.

Essex' arguments rely on two ancient and powerful principles of interpretation. The first is reflected in the maxim "expressio unius est exclusio alterius." The second is the principle that a contract is to be construed against its drafter. To agree to an indexed price term subject to a ceiling but without a floor is to make a deliberate choice, Essex argues. It is to choose one principle and to reject another. The argument is plausible but not sufficient. The maxim rules no farther than its reason, and its reason is simply this: often an expression of a rule couched in one form reflects with high probability the rejection of a contradictory rule. Less often it reflects a probable rejection of a supplementary rule. To know if this is true of a particular case requires a scrupulous examination of the thing expressed, the thing not expressed, and the context of the expression. The question here is precisely this: By omitting a floor provision did ALCOA accept the risk of any and every deviation of the selected index from its costs, no matter how great or how highly improbable? The course of dealing between the parties repels the idea. Essex and ALCOA are huge industrial enterprises. The management of each is highly trained and highly responsible. The corporate officers have access to and use professional personnel including lawyers, accountants, economists and engineers. The contract was drafted by sophisticated, responsible businessmen who were intensely conscious of the risks inherent in long term contracts and who plainly sought to limit the risks of their undertaking. The parties' laudable attention to risk limitation appears in many ways: in the complex price formula, in the 65% ceiling, in the "most favored customer" clause which Essex wrote into the contract, and in the elaborate "force majeur" clause favoring ALCOA. It appears as well in the care and in the expense of the negotiations and drafting process. Essex negotiated with several aluminum producers, seeking a long term assured sup-

ply, before agreeing to the ALCOA contract. Its search for an assured long term supply for its aluminum product plants itself bespeaks a motive of limiting risks. Essex settled on ALCOA's offer rather than a proffered joint venture on the basis of many considerations including the required capital, engineering and management demands of the joint venture, the cost, and the comparative risks and burdens of the two arrangements. When ALCOA proposed the price formula which appears in the contract, Essex's management examined the past behavior of the indices for stability to assure they would not cause their final aluminum cost to deviate unacceptably from the going market rate. ALCOA's management was equally attentive to risk limitation. They went so far as to retain the noted economist Dr. Alan Greenspan as a consultant to advise them on the drafting of an objective pricing formula. They selected the WPI–IC as a pricing element for this long term contract only after they assured themselves that it had closely tracked ALCOA's non–labor production costs for many years in the past and was highly likely to continue to do so in the future. In the context of the formation of the contract, it is untenable to argue that ALCOA implicitly or expressly assumed a limitless, if highly improbable, risk. On this record, the absence of an express floor limitation can only be understood to imply that the parties deemed the risk too remote and their meaning too clear to trifle with additional negotiation and drafting.

The principle that a writing is to be construed against its maker will not aid Essex here. That principle once sounded as a clarion call to retrograde courts to pervert agreements if they could. Today it is happily domesticated as a rule with diverse uses. In cases involving issues of conscience or of strong policy, such as forfeiture cases, the principle complements the familiar doctrine of strict construction to favor lenient results. In other cases it serves as an aid in resolving otherwise intractable ambiguities. This case presents

neither of these problems. The question of defining the risks ALCOA assumed is one of interpretation. It implicates no strong public policy. Neither does it present an intractable ambiguity.

Neither is this a case of "conscious ignorance" as Essex argues. Essex cites many cases which establish the general rule that mistaken assumptions about the future are not the sort of mistaken assumptions which lead to relief from contractual duties. *Leasco Corp. v. Taussig, supra,* is typical of these cases. The general rule is in fact as Essex states it. But that rule has limited application. The new Restatement notes that the rule does not apply where both parties are unconscious of their ignorance—that is, where both mistakenly believe they know the vital facts. See § 296 Comment C. Compare *White v. Stelloh,* 74 Wis. 435, 43 N.W. 99 (1889) and *Backus v. MacLaury,* 278 App.Div. 504, 106 N.Y.S.2d 401 (1951) with *Sherwood v. Walker, supra.* See Corbin on Contracts §§ 598, 605.

This distinction is sufficient to settle many cases but it is framed too crudely for sensible application to cases like the present one. The distinction posits two polar positions: certain belief that a vital fact is true and certain recognition that a vital fact is unknown. Such certainties are seldom encountered in human affairs. They are particularly rare in the understanding of sophisticated businessmen. In *Taussig* the parties anticipated the subsidiary would earn $200,000 in the year of the sale. Had anyone asked them whether they were certain of that prediction, they would surely have answered that such predictions are always made with the recognition of a range of uncertainty. The prediction indicates that the parties believe there is a good chance that the earnings will lie between $175,000 and $225,000 and a very high probability that they will lie between $100,000 and $300,000. If pressed, the parties might agree that there could be a new loss for the year. But they would regard a loss as very highly unlikely.[10] Of course predictions of

10. The S.E.C. now recognizes that predictions may be validly used in this way by investors.

This recognition underlies the S.E.C.'s departure from the traditional rule forbidding the

future earnings must be viewed skeptically because the people who make them are often vitally interested in their contents and in their uses.

The same notion of a range of uncertainty is not unknown to Indiana law. In *McMahan v. Terkhorn, supra*, the parties contracted to purchase and to sell a tract of land which they thought to contain 133 acres for $15,000. Before the date for performance the purchaser had the land surveyed. The surveyor reported the tract contained 104.52 acres. The parties then adjusted the purchase price to $12,000 and completed the conveyance on that basis. Later the vendor learned the survey was wrong; the tract contained 129 acres. He then sued for and won the value of the "excess" land conveyed. The court distinguished between the normal range of survey error which parties are deemed to expect and to risk, and gross errors for which a remedy is available. Accord, *Harrison v. Talbot*, 32 Ky. 258, 2 Dana 258 (Ky.1834); *Nelson v. Matthews*, 12 Va. 164 (1808); *Quesnel v. Woodlief*, 10 Va. (5 Call.) 218 (1796).

Once courts recognize that supposed specific values lie, and are commonly understood to lie, within a penumbra of uncertainty, and that the range of probability is subject to estimation, the principle of conscious uncertainty requires reformulation. The proper question is not simply whether the parties to a contract were conscious of uncertainty with respect to a vital fact, but whether they believed that uncertainty was effectively limited within a designated range so that they would deem outcomes beyond that range to be highly unlikely. In this case the answer is clear. Both parties knew that the use of an objective price index injected a limited range of uncertainty into their projected return on the contract. Both had every reason to predict

that the likely range of variation would not exceed three cents per pound. That is to say both would have deemed deviations yielding ALCOA less of a return on its investment, work and risk of less than one cent a pound or of more than seven cents a pound to be highly unlikely. Both consciously undertook a closely calculated risk rather than a limitless one. Their mistake concerning its calculation is thus fundamentally unlike the limitless conscious undertaking of an unknown risk which Essex now posits.

What has been said to this point suffices to establish that ALCOA is entitled to some form of relief due to mutual mistake of fact. But the stakes in this case are large, and the chances of review by higher courts are high. Therefore the Court thinks it appropriate to rule on two other theories which ALCOA presented in support of its first count.

### D.

ALCOA argues that it is entitled to relief on the grounds of impracticability and frustration of purpose. The Court agrees.

In broad outline the doctrines of impracticability and of frustration of purpose resemble the doctrine of mistake. All three doctrines discharge an obligor from his duty to perform a contract where a failure of a basic assumption of the parties produces a grave failure of the equivalence of value of the exchange to the parties. And all three are qualified by the same notions of risk assumption and allocation. The doctrine of mistake of fact requires that the mistake relate to a basic assumption on which the contract was made. The doctrine of impracticability requires that the non-occurrence of the "event", Restatement 2d of Contracts § 281,[11] or the non-existence of

inclusion of predictions in S.E.C. filings to the new rule permitting their inclusion. S.E.C. recognition of the range of uncertainty principle appears in the proposal of "safe harbor" provisions. See S.E.C. Release No. 33–5362, Disclosure of Projections of Future Economic Performance, 38 F.R. 7220 (Mar. 19, 1973); S.E.C.

Release No. 33 5592 Disclosure of Projections of Future Economic Performance, 43 F.R. 53250 (Nov. 7, 1978).

11.
§ 281.   DISCHARGE BY SUPERVENING
        IMPRACTICABILITY.

the "fact", *Id.* § 286, causing the impracticability be a basic assumption on which the contract is made. The doctrine of frustration of purpose similarly rests on the same "non–occurrence" or "non–existence", "basic assumption" equation. *Id.* §§ 285,[12] 286.[13]

The three doctrines further overlap in time. There may be some residual notion that the doctrine of frustration and impracticability relate to occurrences after the execution of the contract while the doctrine of mistake relates to facts as they stand at the time of execution. But that view has never won general acceptance. The first Restatement does not specifically limit the mistakes of fact for which relief may be granted to facts existing at the time of the contract. §§ 500, 502. Corbin and Williston do not suggest such a limitation. And the new Restatement equivocates on the point. Section 293 defines "mistake" as "a belief that is not in accord with the facts." The word "existing" modified the word "facts" in Tentative Draft Number 10 but was deleted by the Reporter. Comment a to the section does declare:

> [T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here.

This declaration is anomalous and unexplained. The Court believes the definition rather than the comment expresses the better rule. The denial of relief for mistakes of future facts is better understood to rest on policies of risk allocation discussed above than to rest on the definition of "mistake."

*National Presto Industries, Inc. v. United States,* 338 F.2d 99 (Ct.Cl.1964), is a prime example of the application of the doctrine of mistake to developments after the execution of the contract. There the corporation contracted to produce artillery shells for the Army at a fixed price, using a new and only partially proven production method. The method was contrived to reduce wasted steel by eliminating the need for shaving excess metal from the shells. After the contract was signed, the corporation spent large sums of money in unsuccessful attempts to make the method work. Eventually it became clear that some shaving would be required. The corporation purchased the necessary equipment and paid for the materials and labor. Then it sought and obtained relief in the Court of Claims for its added expense. The court held that there had been an actionable mutual mistake of fact. The assumed capacity of the new method to produce shells without a shaving step proved to be mistaken.[14] The

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

**12.**
§ 285. DISCHARGE BY SUPERVENING FRUSTRATION.

Where, after a contract is made, a party's principle purpose is substantially frustrated without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

**13.**
§ 286. EXISTING IMPRACTICABILITY OR FRUSTRATION.

(1) Where, at the time a contract is made, a party's performance under it is impracticable

without his fault because of a fact of which he has no reason to know and the non–existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

(2) Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non–existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary.

**14.** The court further held that the corporation had not assumed the risk of the experiment by entering into an unconditional fixed price contract. The court found that the parties did not contemplate the hazard and did not assign its risk. 338 F.2d at 109–110. The court further found that the actual cost of testing and development in attempting to perfect the new method exceeded the testing expense implicitly risked by the corporation. 338 F.2d at 109.

court based its decision solely on mistake of fact. It does not appear that frustration or impracticability were considered.

Conversely the notion that the doctrines of frustration and impracticability apply only to events occurring after the execution of a contract appear to be drawn more from common experience with their application than from any inherent limitation of those doctrines. Nothing in the language of the first Restatement limits the doctrine to events occurring after the execution of the contract, though all three illustrations involve such supervening events. § 288. The new Restatement recognizes that circumstances existing at the execution of a contract may render performance impracticable or they may frustrate the purpose of one of the parties so as to excuse his performance. § 286.

Thus there is a substantial area of similarity between the three doctrines. Within that area, the findings and holdings with respect to the claim of mistake also apply to the claims of impracticability and frustration. It requires no further discussion to establish that the non–occurrence of an extreme deviation of the WPI–IC and AL-COA's non–labor production costs was a basic assumption on which the contract was made. And it is clear that ALCOA neither assumed nor bore the risk of the deviation beyond the foreseeable limits of risk.

The court must still consider those aspects of doctrines of frustration and impracticability which differ from the doctrine of mistake. In the Foreward to Tentative Draft No. 10 of the New Restatement, Professor Wechsler wrote, "Cases involving impracticability or frustration . . . involve mistake but to the extent that the focus is on hardships to the adversely affected party [they receive separate treatment]."

The focus of the doctrines of impracticability and of frustration is distinctly on hardship. Section 281 declares a party is discharged from performing a contract where a supervening event renders his performance impracticable. Comment d discusses the meaning of "impracticability."

The comment states the word is taken from Uniform Commercial Code § 2–615(a). It declares that the word denotes an impediment to performance lying between "impossibility" and "impracticality".

Performance may be impracticable because *extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved.* . . .

A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed–price contract is intended to cover. Restatement 2nd Contracts § 281 com. (d).

Similarly, § 285 declares a party is discharged from performing his contract where his principal purpose is *substantially* frustrated by the occurrence of a supervening event. The extent of the necessary frustration is further described in comment a: "[T]he frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract."

Professor Corbin explained this requirement of a severe disappointment by relating this doctrine to the broad public policies that parties should generally be required to perform their contracts.

Variations in the value of a promised performance, caused by the constantly varying factors that affect the bargaining appetites of men, are the rule rather than the exception. Bargainers know this and swallow their losses and disappointments, meantime keeping their promises. Such being the business mores, court decisions that are not in harmony with them will not make for satisfaction or prosperity. Relief from duty, outside of the bankruptcy court, can safely be granted on the ground of frustration of purpose by the rise or fall of values, only when the variation in value is very great

and is caused by a supervening event that was not in fact contemplated by the parties and the risk of which was not allocated by them. Corbin on Contracts § 1355. This strict standard of severe disappointment is clearly met in the present case. ALCOA has sufficiently proved that it will lose well over $60 million dollars out of pocket over the life of the contract due to the extreme deviation of the WPI–IC from ALCOA's actual costs.[15]

Is this, then, a case of impracticability, of frustration, or both? The doctrine of impracticability and of frustration focus on different kinds of disappointment of a contracting party. Impracticability focuses on occurrences which greatly increase the costs, difficulty, or risk of the party's performance. Restatement 2d of Contracts § 281.

The doctrine of frustration, on the other hand, focuses on a party's severe disappointment which is caused by circumstances which frustrate his principal purpose for entering the contract.[16] Restatement 2d of Contracts § 285. The doctrine of frustration often applies to relieve a party of a contract which could be performed without impediment; relief is allowed because the performance would be of little value to the frustrated party. Illustration 1 of the new Restatement—abstracted from the Coronation Cases—typifies this aspect of the doctrine of frustration.

A and B make a contract under which B is to pay A $1,000 and is to have the use of A's window on January 10 to view a parade that has been scheduled for that day. Because of the illness of an impor-

tant official, the parade is cancelled. B refuses to use the window or pay the $1,000. B's duty to pay $1,000 is discharged, and B is not liable to A for breach of contract.

Nothing impedes the full performance of this contract. B is able to pay $1,000 and to use the window despite the cancellation of the parade. But B's purpose—to observe the spectacle—has been frustrated.

In the present case ALCOA has satisfied the requirements of both doctrines. The impracticability of its performance is clear. The increase in its cost of performance is severe enough to warrant relief, and the other elements necessary for the granting of relief have been proven. Essex argues that the causes of ALCOA's losses are due to market price increases to which the doctrine of impracticability does not apply. The doctrine of impracticability of the new Restatement is one of recent evolution in the law. The first Restatement used the term as part of the definition of "impossibility." The interesting legal evolution from the strict standards of impossibility, evident at least by dictum in *Parradine v. Jane*, Aleyn, 26 (1647, K.B.), to modern standards of impracticability is traced in Professor Gilmore's The Death of Contract 35–90 (1974). The drafters of the Uniform Commercial Code adopted this line of development, particularly in § 2–615. The new Restatement expressly draws upon § 2–615 in defining the scope of the doctrine. § 281 comments reporter's notes. The official comment to § 2–615 lends strength to Essex's claim.

15. The Court recognizes the additional requirement that the frustration or impracticability must not be the fault of the party who seeks relief. Restatement 2d of Contracts §§ 281, 285. Essex has not claimed or shown that ALCOA's dealings during the contract caused or contributed to ALCOA's losses. The record sufficiently proves that the great cost increases of some of the non–labor cost components (power, electrolytes, carbon) were beyond AL-COA's control. This distinguishes the present case from *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 467 F.Supp. 129 (N.D.Iowa 1978) where the court concluded that it was not clear that Atlas, a uranium supplier, could not have protected itself contractually from some of the risk which caused its loss. *Id.* 129.

16. Professor Corbin primely observed, "A 'contract' never has a purpose or object. Only the contracting persons have purposes; and the purpose of any one of these persons is different from the purpose of any other. The hopes and purposes and objects of one of the parties may be frustrated by supervening events, although the purposes of the other party may not be at all affected by those events." Corbin on Contracts § 1353.

1. This section excuses a seller from timely delivery of goods contracted for, where his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting.

. . . . .

However,

4. Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance is within the contemplation of this section.

Several of the cases cited by Essex rely on comment 4 in denying claims for relief. *Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C.Cir.1966); *Publicker Industries, Inc. v. Union Carbide Corp.*, 17 UCC Rep. 989 (E.D.Pa.1975); *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975); *Maple Farms, Inc. v. City School District*, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (1974); *Iowa Elec. Light & Power Co. v. Atlas Corp.*, *supra*. Each is distinguishable from the present case in the absolute extent of the loss and in the proportion of loss involved.

In *Publicker Industries,* the defendant Union Carbide had contracted in 1972 to sell ethanol in specified quantites over a three year period to the plaintiff. The price was set by a formula, adjusted annually to reflect the seller's cost for raw materials, and subject to a ceiling on adjustment increases. The raw materials were derivatives of natural gas; their price soared beginning in 1973 as did ALCOA's energy costs. The seller's costs for ethanol rose from 21.2 cents a gallon in 1973 to 37.2 cents per gallon in mid–1974. The ceiling contract sales price was then 26.5 cents per gallon. The seller's loss of 10.7 cents per gallon led to a projected aggregate loss of $5.8 million. The court refused to relieve the seller. It found that the ceiling provision constituted an intentional allocation of the "risk of a substantial and unforeseen rise in cost" to the seller. It based this finding in part on the twenty-five percent rise in prices by OPEC in 1971 which made future cost increases highly foreseeable. The court addressed the degree of loss issue, declaring:

We are not aware of any cases where something less than a 100% cost increase has been held to make a seller's performance 'impracticable.'

. . . '[T]here must be more of a variation between expected cost and the cost of performing by an available alternative than is present in this case, where the promisor can legitimately be presumed to have accepted some degree of abnormal risk, and where impracticability is urged on the basis of added expense alone.' [17]
*Id.* at 992.

*Publicker Industries* is clearly distinguishable from the present case respecting the degree of loss which the seller suffered in comparison to what it foresaw at the time of contracting. The fact that the Publicker contract was made after the substantial price increase of 1971 may justify the court's finding that the seller had assumed the risk of further large price increases. The contract in the present case antedated the 1971 price increase. There is no similar factual basis for finding that ALCOA assumed the risk of the full loss which it is experiencing.

*Transatlantic Financing Corp. v. United States, supra,* was one of the "Suez" cases. The carrier had contracted to transport a cargo from the United States to Iran for a specified price. The contract did not specify the route, but both parties knew the

[17] Quoting *Transatlantic Financing Corp. v. United States, supra.*

most direct route was by way of Suez. When the Canal was closed the carrier had to divert its ships around Cape Horn, adding three thousand miles to the expected ten thousand mile voyage, and adding an expense of about $44,000 to the contract price of about $306,000. Judge J. Skelly Wright, for a unanimous panel, found that "circumstances surrounding the contract indicate that the risk of the Canal's closure may be deemed to have been allocated to Transatlantic." But he found this conclusion doubtful enough to cause him to reject a direct application of the risk allocation rule. He went on:

> The surrounding circumstances do indicate, however, a willingness by Transatlantic to assume abnormal risks, and this fact should legitimately cause us to judge the impracticability of performance by an alternate route in stricter terms than we would were the contingency unforeseen. *Id.* at 318–19.

Judge Wright then held, in the passage quoted in *Publicker Industries, supra*, that there must be more than a twelve percent cost increase to constitute impracticability.

Here ALCOA's loss is more than a thousand times greater than the carrier's loss. And the circumstances surrounding the contract show a deliberate avoidance of abnormal risks.

*Maple Farms, Inc. v. City School District, supra*, follows much the same pattern. The plaintiff contracted to supply milk to the school district for the 1973–74 school year at a fixed price. During the three years prior to the contract, the price of raw milk had increased twelve percent. It had increased 9.5% from a 1972 low to the making of the contract. Consumer prices generally had increased even more. From the making of the contract in June, 1973 until December, 1973 the price increased another 23% resulting in an over–all loss to the plaintiff of $7,350.55. The plaintiff's total cost in December, 1973 exceeded the contract price per half–pint by 10.4%. The court relied on Comment 4 to § 2–615 and on *Transatlantic Financing* in denying the plaintiff relief. The court emphasized that the price increase was foreseeable when the contract was made, and that the contract was intended to guard against price fluctuation. The court concluded:

> There is no precise point, though such could conceivably be reached, at which an increase in the price of raw goods above the norm would be so disproportionate to the risk assumed as to amount to 'impracticality' [sic] in a commercial sense. However we cannot say on these facts that the increase here has reached the point of 'impracticality' in performing this contract in light of the risks that we find were assumed by the plaintiff. *Id.* at 790.

*Eastern Air Lines Inc. v. Gulf Oil Corp., supra*, follows the pattern of these cases except in one detail. Gulf had contracted to furnish jet fuel to Eastern in designated cities from June 1972 until January 31, 1977. The price was tied to a specific trade journal report of posted prices for a specified type of domestic oil. During the contract the price of imported oil soared. Domestic oil was subjected to a complex and shifting body of regulations including a "two–tier" price control scheme regulating the price of "old oil" but not the price of "new oil." The specified trade journal reacted to the new system by publishing prices only for the regulated "old oil." Gulf sought to escape the burden of its contract and Eastern sued to compel Gulf to perform it.

The court required Gulf to perform the contract. It found that Gulf had failed to prove its defense. The "cost" figures in evidence included built in intra–company profits such that the court could not "determine how much it costs Gulf to produce a gallon of jet fuel for sale to Eastern, whether Gulf loses money or makes a profit on its sale of jet fuel to Eastern, either now or at the inception of the contract, or at any time in between." *Id.* at 440. Thus Gulf failed to prove it had suffered losses on the contract.

In the course of the decision the court declared that relief was available under § 2–615 for an *unforeseeable* failure of a

pre–supposed condition. It inferred this requirement from Comment 8 to § 2–615 [18] and from the Suez cases. If it were generally adopted, this requirement would reduce the occasions for excusing performance under § 2–615. Judge Wright rejected such a requirement in *Transatlantic Financing*, declaring:

> Foreseeability or even recognition of a risk does not necessarily prove its allocation.... Parties to a contract are not always able to provide for all the possibilities of which they are aware, sometimes because they cannot agree, often simply because they are too busy. Moreover, that some abnormal risk was contemplated is probative but does not necessarily establish an allocation of the risk of the contingency which actually occurs. 363 F.2d at 318.

The question is important in the developing doctrine of impracticability. The Indiana cases are silent on it. The Court believes that Indiana courts would find Judge Wright's approach is more in keeping with the spirit and purpose of the Uniform Commercial Code than is the strict approach of Judge King in *Eastern Air Lines*. The Code, embodied in Title 26, Burns Ind.Stat. Ann. (1974) seeks to accommodate the law to sound commercial sense and practice. Courts must decide the point at which the community's interest in predictable contract enforcement shall yield to the fact that enforcement of a particular contract would be commercially senseless and unjust. The spirit of the Code is that such decisions cannot justly derive from legal abstractions. They must derive from courts sensitive to the mores, practices and habits of thought in the respectable commercial world.

If it were important to the decision of this case, the Court would hold that the foreseeability of a variation between the WPI–IC and ALCOA's costs would not preclude relief under the doctrine of impracticability. But the need for such a holding is not clear, for the Court has found that the risk of a wide variation between these values was unforeseeable in a commercial sense and was not allocated to ALCOA in the contract.

The Court holds that ALCOA is entitled to relief under the doctrine of impracticability. The cases Essex relies on and the other cases discovered by the Court are all distinguishable with respect to the gravity of harm which the aggrieved contracting party was liable to suffer. Except for *Transatlantic Financing*, they are also distinguishable with respect to the question of allocation of the risk, inferred from the circumstances known to the parties at the time of the contract and from the contract terms.

ALCOA's claim of frustration requires more discussion. ALCOA's "principal purpose" in making the contract was to earn money. This purpose has plainly been severely disappointed. The gravity of ALCOA's loss is undisputably sufficient to meet the stern standard for relief. But the question remains whether the law will grant relief for the serious frustration of this kind of purpose, *i. e.*, for the conversion of an expected profit into a serious loss. All of the new Restatement illustrations center on purposes other than making a profit. However most of them bear on some stage of a profit oriented activity. Illustrations 2–7 describe profit oriented business activities which contribute to the success of enterprises though they are not themselves directly profitable. In each, the question is whether the immediate end of this discrete contract is frustrated, without regard to the impact of the frustration on the more remote end of earning profits. Thus illustration 4 involves a lease of a neon sign to a business. A subsequent gov-

---

18. 8. The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances ....

ernmental regulation prohibits illuminating the sign. The Restatement declares the lessee's duty to pay rent to be discharged. Here the lessee's most immediate principal purpose is night–time advertising.

Illustration 6 [19] involves a gasoline station lease. A change in traffic regulations reduces the lessee's business that he can operate only at a substantial loss. The Restatement declares: "If B can still operate a station . . . his principal purpose of operating a gasoline station is not substantially frustrated." Here the profit is not deemed the principal purpose of the lessee. The operation of the gas station is that purpose. Why should a court or the Restatement prefer one characterization to the other? Perhaps it is due to the fact that the dispute involves a lease. Professor Corbin notes that this result is generally supported by the leasehold cases but that the reason for the result has changed over the years.

It was formerly thought to be a sufficient reason for making the lessee pay the agreed rent that he promised in general and unlimited terms, when he might have provided against such contingencies in his contract. He has "assumed the risk" by not having the foresight to exclude it in express terms. This reason has long since ceased to be convincing, as is shown by the multitude of cases holding that a promisor's duty is discharged by the supervening events that make his performance impossible. Whether the frustration of the tenant's purposes operates in discharge of his duty depends upon all the circumstances, especially upon the extent of that frustration and the prevailing practices of men in like cases. Professor Corbin clearly associates the result in such cases with the concept of judicial risk allocation. Among the factors entitled to serious consideration by the courts are the lessee's alternative uses of the premises; whether the lease is for a long term or a short term; whether the lessee's special intended use was known to the lessor, and whether that special use was reflected in the rental terms. The common understanding of business people who enter such leases is also important. A business lease is, among other things, the conveyance of a possessory interest in property for a term. Lessors are not commonly understood to insure the success of the business to be conducted on the premises. Williston does not wholly disagree, though he insists that relief should be granted only for "the total or nearly total destruction of the purpose for which, in the contemplation of both parties, the transaction was entered into." Williston on Contracts §§ 1955, 1961 (3d ed. 1978) (Jaeger). In light of this commentary, the Court infers that illustration 6 rests on the particular circumstances of the lease rather than on an implicit limitation of the general language of § 285 which precludes the earning of profits and avoidance (or limitation) of losses from being "the principal purpose" of a party.

In § 1360 Professor Corbin demonstrates that at times courts should treat loss avoidance as a principal purpose of a party. That section deals with frustration of purpose caused by inflationary depreciation of money. Corbin demonstrates that the decisions are not uniform on this subject, but he rejects as reprehensible the nominalist rule that a dollar's a dollar no matter how small. The injustice of the nominalist position was clearly recognized in the case of *Anderson v. Equitable Life Assurance Society*, 134 L.T. 557, 42 T.L.R. 302 (1926). The facts in *Anderson* were these: In 1887 an Englishman in Russia took out a twenty–premium life insurance policy with premiums and benefits payable in German marks. The policy benefit was 60,000 marks. The premiums were paid from 1887 to 1907 and were converted, as both parties understood they would be, into pounds. Their value came to £ 2,377. The insured died in 1922 at the height of the German hyperinflation. At that time the value of 60,000 marks was less than an English penny. The insurer argued that it owed nothing on the contract, for it could not be required to pay a fraction of a cent. Astonishingly, the court agreed. Under English law the obligation to pay in foreign currency was absolute and

**19.** This illustration appears as Illustration 7 to § 285 in Tentative Draft No. 9.

unqualified by variations in exchange rates. The judges noted the harshness of the result and pressed upon the company its moral obligation to make some payment which they held the law would not compel.

Happily some American cases and the law of many foreign countries take a different view of the problem. The problem of serious, sustained inflation is not unique to modern America. During the Revolution and the Civil War, America witnessed serious inflation. And several other nations have recently experienced more severe inflation than America has. When the problem has arisen, here and abroad, courts and legislatures have repeatedly acted to relieve parties from great and unexpected losses. See Mann, The Legal Aspect of Money (1938); Corbin on Contracts § 1360 and cases there cited.[20] The exact character of the relief granted is not important here. Neither is the exact explanation of the decisions found in the cases, because even the Civil War cases antedate the evolution of the distinct doctrine of frustration. What is important is this: first, the results of those decisions would be readily explained today in terms of frustration of purpose. Corbin discusses them in his chapter on Frustration of Purpose. And second, the frustration which they involved was a frustration of the purpose to earn money or to avoid losses. Thus it appears that there is no legitimate doctrinal problem which prevents relief for frustration of this sort. There remain the customary strictures concerning risk allocation and gravity of injury. Those have been addressed above and need not be considered again here. The Court holds ALCOA is entitled to relief on its claim of frustration of purpose.

### E.

This leaves the question of framing a remedy for ALCOA. Essex argues that reformation is not available. It cites many Indiana cases declaring that reformation is only available to correct writings which, through mistake, do not reflect the agreement of the parties. The declarations to that effect are clear. *E. g., Citizens Nat'l Bank v. Judy*, 146 Ind. 322, 43 N.E. 259 (1896); *Board of Comm'rs v. Owens*, 138 Ind. 183, 37 N.E. 602 (1894); *Sunman–Dearborn Community Corp. v. Kral–Zepf–Freitag & Associates*, 338 N.E.2d 707 (Ind.App. 1975).

But the point is immaterial here. This case does not fall within reformation as a traditional head of equity jurisprudence. It does fall within the more general rules of equitable restitution. Courts have traditionally applied three remedial rules in cases of mistake, frustration and impracticability. In some cases courts declare that no contract ever arose because there was no true agreement between the parties, *Raffles v. Wichelhaus, supra,* or because the parties were ignorant of existing facts which frustrated the purpose of one party or made performance impracticable. Restatement 2d of Contracts § 286. In some other cases the courts hold that a contract is voidable on one of the three theories. In these cases the customary remedy is rescission. In both classes of cases where one or both parties have performed under the supposed contract, the courts award appropriate restitution in the light of the benefits the parties have conferred on each other. The aim is to prevent unjust enrichment. The courts in such cases often call this remedy "reformation" in the loose sense of "modification." See III Palmer, Law of Restitution § 13.9 (1978). In *Schwaderer v.*

**20.** During the trial of this case, the Court asked counsel to provide it with information about the treatment of this problem in countries which have suffered prolonged and serious inflation including Argentina, Brazil, Germany, Israel and Japan. Each of these countries allows legal adjustments to contracts to alleviate windfall losses and to reduce related windfall profits by legislation, by judicial declaration or both. An abstract of those foreign laws prepared by counsel appears as an appendix to this decision. That all of these countries provide relief from inflationary losses strongly suggests the propriety of the earlier American decisions. The time of the Law Merchant is past, and our legal system differs from theirs, but America has no monopoly on wisdom and may well profit from the experience and learning of other nations.

*Huron–Clinton Metropolitan Authority*, 329 Mich. 258, 45 N.W.2d 279 (1951), the plaintiff contracted to clear a tract of land of trees and brush. The parties mistakenly believed the tract contained 239 acres, and on that belief the plaintiff bid $59,000 for the job. In fact the land contained 545 acres. The court "reformed" the contract to award the plaintiff the value of the extra work it had performed. Professor Palmer says this of *Schwaderer* and similar cases:

> [T]he judgment is aimed at carving out and leaving intact an exchange that approximates or is in substance the one the parties had in mind, and at the same time readjusting the contract or its consequences so as to prevent unjust enrichment.
>
> The cases ... demonstrate that many situations do not fit neatly into a general scheme of classification. There are many typical cases for which a standard remedy is appropriate; there are also cases for which the relief given should be responsible to the particular facts. III Palmer, Law of Restitution § 13.9 at 61–62.

Indiana has accepted this remedial theory. In *McMahan v. Terkhorn, supra*, the parties had purchased and sold a tract of land at a price less than their contract price in reliance on a survey which erroneously showed there was less land in the tract than the parties had believed. After the sale and before the survey error was discovered the purchaser resold part of the land, making rescission inappropriate. The court "reformed" or modified the contract to require the purchaser to pay for the extra land which had been conveyed. There, in a fully executed contract, a price adjustment was necessary to protect the fair expectation of the parties and to prevent unjust enrichment.

The same ends can be achieved under a long term executory contract by a similar remedy. To decree rescission in this case would be to grant ALCOA a windfall gain in the current aluminum market. It would at the same time deprive Essex of the assured long term aluminum supply which it obtained under the contract and of the gains it legitimately may enforce within the scope of the risk ALCOA bears under the contract. A remedy which merely shifts the windfall gains and losses is neither required nor permitted by Indiana law.

To frame an equitable remedy where frustration, impracticability or mistake prevent strict enforcement of a long term executory contract requires a careful examination of the circumstances of the contract, the purposes of the parties, and the circumstances which upset the contract. For some long term executory contracts rescission with or without restitution will be the only sensible remedy. Where developments make performance of the contract economically senseless or purposeless, to modify the contract and to enforce it as modified would be highly inappropriate. But in cases like the present one modification and enforcement may be the only proper remedy.[21] See *Parev Products Co. v. I. Rokeach and Sons, Inc.*, 124 F.2d 147 (2nd Cir. 1941). In this case Essex sought an assured long term supply of aluminum at a price which would let it earn a profit on its finished products. ALCOA, facing ordinary market risks in 1967, sought a long term, limited risk use for its Warrick Works. A remedy modifying the price term of the contract in light of the circumstances which upset the price formula will better preserve the purposes and expectations of the parties than any other remedy. Such a remedy is essential to avoid injustice in this case.

During the trial the parties agreed that a modification of the price term to require Essex to pay ALCOA the ceiling price specified in the contract would be an appropriate remedy if the Court held for ALCOA. The Court understands from the parties that ALCOA will continue to suffer a substantial but smaller out of pocket loss at this price level. But ALCOA has not argued

---

**21.** The remedial provisions of the new Restatement agree. Section 296(2) declares that a court may frame a remedy by supplying a term which is reasonable in the circumstances to avoid injustice. The same provision appears in § 300(2).

that the ceiling price term is subject to the same basic assumptions about risk limitation as is the indexed price term. Accordingly the Court adopts the ceiling price term as part of the remedy it grants to ALCOA.

The Court must recognize, though, that before the contract expires economic changes may make this remedy excessively favorable to ALCOA. To deal with that possibility, the Court must frame a remedy which is suitable to the expectations and to the original agreement of the parties. A price fixed at the contract ceiling could redound to ALCOA's great profit and to Essex's great loss in changed circumstances. Therefore the Court adopts the following remedial scheme. For the duration of the contract the price for each pound of aluminum converted by ALCOA shall be the lesser of the current Price A or Price B indicated below.

*Price A* shall be the contract ceiling price computed periodically as specified in the contract.

*Price B* shall be the greater of the current Price B1 or Price B2. *Price B1* shall be the price specified in the contract, computed according to the terms of the contract. *Price B2* shall be that price which yields ALCOA a profit of one cent per pound of aluminum converted. This will generally yield Essex the benefit of its favorable bargain, and it will reduce ALCOA's disappointment to the limit of risk the parties expected in making the contract. The profit shall be computed using the same accounting methods used for the production of plaintiff's exhibit 431. The profit and the resulting price shall be computed once each calendar quarter, as soon after the close of the quarter as the necessary information may be assembled. When Price B2 applies, ALCOA shall bill Essex periodically, as specified in the contract at the price specified at the last quarterly price computation. Essex shall pay those bills according to the payment terms previously observed by the parties. When the next quarterly price computation is completed, that price shall be applied retroactively to the aluminum converted during the previous quarter. ALCOA shall refund any surplus payment by Essex upon the computation of the price or shall bill Essex for any additional money due.

ALCOA shall keep detailed records of the pertinent costs, indices and computations used to calculate Prices A, B1 and B2 and shall preserve them for two years beyond the termination of the contract. ALCOA shall send Essex, in the manner and at the times specified in the contract, the price information called for in the contract, as well as a quarterly statement of Price B2 whether or not that price then applies. The statement of Price B2 need not specify the elements from which it was calculated.[22]

### COUNT TWO

■ Another issue before this Court is whether the Molten Metal Agreement (MMA) was orally modified. And if so, is that a valid modification under the statute of frauds?

On July 21, 1975, Mr. George, Mr. O'Malley and others had a brief meeting in a hangar maintained by Essex Group Inc. at Deer Field in Fort Wayne, Indiana. At this meeting Mr. George, on behalf of ALCOA, presented a proposal to revise the MMA by substituting for the wholesale price index, terms more favorable to ALCOA.[23] During the meeting all the participants, except Mr. George and Mr. O'Malley, withdrew so that at the conclusion of the meeting only these two men remained.[24]

Differing testimony as to what occurred at this meeting presents the factual issue of

**22.** The Court recognizes that certain cost information of ALCOA may be appropriately treated as a trade secret, disclosure of which is not necessary to the framing and enforcement of this remedy. The Court believes that the statement here required, coupled with the mandatory private record maintenance will assure the enforceability of the remedy while accommodating ALCOA's legitimate needs.

**23.** Transcript of trial testimony at 1271.

**24.** Id. at 214, 1273.

whether the contract was orally modified. Plaintiff's representative has testified that defendant's representative agreed to the proposal[25] while defendant's representative has testified he only agreed to consider the proposal.[26]

ALCOA bears the burden of proof that the parties agreed to modify their 1967 contract, for ALCOA here seeks to enforce the claimed modification. ALCOA has not proved by a preponderance of the evidence that the parties agreed to it. Mr. O'Malley and Mr. George credibly testified to their respective recollections of their conversation. Mr. George's version does not seem more credible than Mr. O'Malley's. Neither do the surrounding circumstances make it so.

In the instant case a number of factors need to be considered. Essex was under no duty or pressure to agree to revise the contract. The negotiations on modification were entered into by Mr. O'Malley to ensure a cordial and compatible working relationship between the two companies.[27] This lack of motivation extends to the making of such an agreement by Mr. O'Malley during such a short meeting. At the same time Mr. George, having suddenly become burdened with an onerous contract, was undoubtedly desirous to renegotiate the MMA. In addition the pressures on Mr. George were intensified for he and other members of his party had only a brief period to speak with Mr. O'Malley before departing on another business meeting.[28] Having considered the motives and pressures on each side, the Court finds the differing testimony, beyond question offered in good faith by all witnesses, is quite understandable. In resolving the contradiction the Court finds that the plaintiff has failed by a preponderance of the evidence to have established the contractual necessity,. "meeting of the minds." Having found no oral modification of the MMA, the Court does not reach the issue of whether any alleged oral modification is made unenforceable by the statute of frauds.

## COUNT THREE

In the third count of its complaint, ALCOA asks to be excused from further performance under the Molten Metal Agreement. Under the provisions of paragraph B of the Side Letter Agreement (SLA) which modified the MMA, ALCOA asserts the right to seek a judicial determination that the MMA is a contract for the sale of goods, a determination which would permit either party to terminate the MMA. Consistent with the assertion of this right, ALCOA has asked this Court to determine that the MMA is a contract for the sale of goods. This raises two issues for this Court to determine; is the MMA a contract for the sale of goods, and may ALCOA now ask this Court to make such a determination or is ALCOA estopped from doing so. In order for ALCOA to prevail both issues must be resolved in its favor. This Court holds that on neither issue does ALCOA prevail.

### BACKGROUND OF THE MOLTEN METAL AGREEMENT

During the mid 1960's both Essex, a large wire and cable manufacturer and ALCOA, a large aluminum producer, anticipated an increased demand for aluminum wire and cable products. Essex with its manufacturing and distribution network in copper wire and cable sought to expand its line of business. ALCOA, though a competitor in the aluminum wire and cable business, sought to expand its sales of aluminum by cultivating current manufacturers of wire and cable.

After Essex exhausted the possibility of obtaining an aluminum supply, by various means, from other producers, Essex entered into serious negotiations with ALCOA over a source of supply. These negotiations began in earnest with a meeting May 29, 1967, between Mr. Paul O'Malley, then President of Essex, and Mr. Favorite, Vice President and Sales Manager for ALCOA, who was

**25.** Id. at 211.

**26.** Id. at 1274.

**27.** Id. at 1266.

**28.** Id. at 1274.

accompanied by Mr. Krome George, ALCOA's Vice President–Finance. At the meeting Mr. George outlined a long term toll conversion proposal.

The toll conversion proposal required Essex to obtain alumina for delivery to ALCOA. ALCOA would then process the alumina into aluminum delivering the refined product to Essex. This proposal was consistent with the trend in the aluminum industry toward toll conversion when alumina was in large supply and aluminum in short supply. Since both ALCOA and Essex had existing toll conversion contracts, the proposal was not a unique concept to either party.

Mr. O'Malley who was seeking a long term supply of aluminum raised the issue of where he could obtain alumina on a long term basis to complement the toll conversion contract. He was informed by Mr. George that Essex would be put in touch with Australian alumina firms seeking just such contracts.

From this oral discussion, Mr. Joseph Fisher, an ALCOA attorney, prepared a draft contract. This was submitted on July 21, 1967 to Essex. The draft provides for a toll conversion process as outlined above. This concept is also the essence of the Molten Metal Agreement (MMA) which was eventually signed.

Several aspects of this draft and the contract delineate that toll conversion is the foundation for the contract. They are:

(a) Essex must maintain certain specified levels of alumina inventory;

(b) The alumina delivered to ALCOA is deemed to be stored in Indiana, and Essex is required to pay (and has in fact, paid) personal property taxes on such alumina to Indiana;

(c) Essex bears the risk of availability and performance of the carriers, the risk of cost fluctuations in providing transport and the risk of casualty loss in transit; and

(d) Essex bears the risk with regard to the price, availability and quality of the alumina.

## THE ALUMINA PURCHASE AGREEMENT

Essex, recognizing its need for a long term source of alumina if it entered into a toll conversion contract, entered into simultaneous negotiations with an alumina producer. That producer was Alcoa of Australia Proprietary Ltd. (Alcoa Ltd.). Alcoa Ltd. is an Australian corporation in which ALCOA has a 51% stock interest, and majority representation on the board of directors. The remaining interests are held by three (3) Australian based mining companies. Consistent with the laws of Australia, and in recognition of fiduciary duties owed to the minority interests, Alcoa Ltd. has been maintained as a separate and distinct entity by ALCOA. In fact, ALCOA and Alcoa Ltd. are competitors for sales of many aluminum products.

On July 8, 1967, Mr. O'Malley met with Mr. Allen Sheldon, Managing Director of Alcoa Ltd. to discuss a possible alumina supply contract. Mr. Sheldon offered alumina at the then prevailing world price of fifty seven dollars ($57.00) per ton.

Further discussions were held on October 17, 1967. Essex requested a ceiling price of seventy dollars ($70.00) per ton and a most favored customer clause. These discussions were attended by Mr. O'Malley, Essex counsel Mr. Seifert, Mr. Sheldon, and Mr. Bank Smith, who was introduced as a legal representative assisting Mr. Sheldon. Mr. Smith was in charge of drafting the precise contract language of what eventually became the Alumina Purchase Agreement (APA). Though assigned to work on behalf of Alcoa Ltd., he was actually employed by ALCOA not Alcoa Ltd. However, with due deference to antitrust considerations, Mr. Smith was assigned this work by persons other than those involved in the Molten Metal Agreement negotiations, and all knowledge obtained by the participants in negotiation of one contract was intentionally kept from the participants in the other.

Mr. George, a member of the board of Alcoa Ltd., in addition to his duties with ALCOA, refrained, on advice of counsel,

from becoming involved in the Alumina Purchase Agreement negotiations. Further, the Economic Analysis and Planning Department of ALCOA, which reported to Mr. George, provided no material on pricing or escalation provisions for Alcoa Ltd.

On January 4, 1968, eventual agreement was reached. On January 30, 1968 the Alumina Purchase Agreement was approved, by the board of directors of Alcoa Ltd., without judging the price negotiated by their agents.

## THE FINALIZATION OF THE MOLTEN METAL AGREEMENT WITH THE SIDE LETTER AGREEMENT

Before the MMA had become finalized, Mr. Fisher did learn that Alcoa Ltd. might be supplying the alumina to Essex and that shipment from Australia of the alumina might also be via Alcoa Steamship Co. This caused him to express some concern about potential illegality under the Robinson–Patman Act. He expressed these concerns to Mr. Seifert and Mr. Downing, Essex house counsel. Mr. Fisher suggested that a cancellation clause should be included in the MMA. Such a clause would provide that should the MMA be construed as a sale of goods, or be found illegal, either party could cancel at will. Since the Essex attorneys had previously negotiated for a most favored customer clause in fear that they would be locked into a price higher than that obtained by others, they had few concerns that the MMA would be illegal under the Robinson–Patman Act for granting Essex a discriminatory price advantage. However they did agree to the inclusion of a cancellation clause, as drafted by Mr. Fisher. This provision was made part of the Molten Metal Agreement by its inclusion as paragraph B of the Side Letter Agreement.

With this history, the cancellation clause was never the focus of intense negotiations. It was included without having been brought to the attention of Mr. O'Malley. All parties, while acting in good faith, agreed that the agreement was the sale of service not goods. No discussion ever occurred that either party could attempt to terminate the MMA by seeking a judicial determination against the other. At the time of execution both sides contemplated that the cancellation clause would become operative only upon a sale of goods determination made at the initiation of a Robinson–Patman claim by a third party.

## THE RELATION BETWEEN THE MMA AND THE APA

The performance of the Molten Metal Agreement and the Alumina Purchase Agreement have steadfastly been kept separate. The chairman of the ALCOA committee to administer the MMA, Mr. Favorite, has never responded to problems or concerns Essex has had with Alcoa Ltd. but rather has referred Essex to Alcoa Ltd. The accounting under the MMA has consistently been done on a toll conversion basis. ALCOA's bookkeeping indicates Essex owns the alumina until converted, and appropriate deductions are made from Essex's alumina inventory on delivery of the aluminum.

Two periods of contract administration indicate the separate status of these two contracts. During 1968, Alcoa Ltd. in order to fulfill its obligations to Essex borrowed alumina from ALCOA. This loan was made at seven percent (7%) interest. Although ALCOA often makes transfers of materials between plants, interest is not charged, as it was here. Alcoa Ltd. continued to bill Essex for delivery of alumina and Essex paid freight equalization charges under the MMA. In this period, ALCOA and Alcoa Ltd. maintained their separate identity.

On October 22, 1973, Essex and ALCOA agreed to a cancellation of Block C and D of the MMA. This did not relieve Essex of its contract with Alcoa Ltd. Alcoa Ltd. indicated it would not relieve Essex because of its banking arrangements but suggested that ALCOA purchase the alumina under these Blocks. ALCOA agreed to this. However, the intervention of the Australian government required ALCOA to purchase the alumina at a higher price than that paid by Essex. This extraction of additional funds by Alcoa Ltd. from ALCOA shows the bona fide separation that existed between these two firms.

84

Essex maintains one other contract with ALCOA. All alumina has been shipped by ALCOA's one hundred percent (100%) owned subsidiary, Alcoa Steamship Co. Essex has been under no obligation either under the MMA or the APA to use such transport, but has independently contracted with that firm.

The history of the negotiations of the MMA indicates that ALCOA and Essex were at all times discussing toll conversion not the sale of goods. This concept originated for valid business considerations not at the behest of lawyers seeking to avoid the appearances of illegality. The language of the MMA is the language of toll conversion. The MMA operates as a service contract requiring Essex to pay personal property taxes to Indiana on the alumina stored there. Although the alumina to be toll converted was obtained from an ALCOA subsidiary, this Court views that fact as little more than coincidence. ALCOA had the power to influence the APA negotiations, but it scrupulously refrained from exercising any portion of that power. The negotiations were conducted separately. ALCOA and Alcoa Ltd. remained consciously ignorant of the terms of their respective offers to Essex. This separate stance was maintained even on the approval of the APA by the Alcoa Ltd. board of directors. It has steadfastly been maintained over the period of contract administration. To collapse the MMA and APA is therefore unwarranted. This Court thus finds the MMA a toll conversion contract, not a contract for the sale of goods.

*ESTOPPEL IN COUNT III*

■ Having decided ALCOA is not entitled to be excused from the MMA, this Court is not obliged to resolve whether ALCOA had the right to seek that determination. However, the Court will address that issue to provide an alternative basis for the result reached. As noted previously the Court is obliged under *Erie* to look to law of

Indiana. The Court must follow the pronouncements of the Indiana courts, particularly when they are of continuing validity. Following this approach ALCOA must be estopped from seeking a determination under the MMA of whether there has been a sale of goods.

■ In *Lebo v. Bowlin*, 100 Ind.App. 75, 189 N.E. 397 (1934) (*en banc*) (unanimous decision), the Court recognized the doctrine of estoppel by contract. This form of estoppel is in many ways similar to estoppel by deed, 31 C.J.S. Estoppel § 55. Both estoppel by contract and estoppel by deed are technical estoppels in which at least one party having made a statement in writing is prevented from taking a position inconsistent with his prior statement. Thus there is no inconsistency between *Lebo* and *Simpson v. Pearson*, 31 Ind. 1 (1869), which recognized three kinds of estoppel, by deed, by record, and *in pais*; for estoppel by contract is interrelated with estoppel by deed.

The technical nature of estoppel by deed was recognized in *McAdams v. Bailey*, 169 Ind. 518, 82 N.E. 1057 (1907).[29] Relying on *Habig v. Dodge*, 127 Ind. 31, 25 N.E. 182 (1890); *Ayer v. Philadelphia*, 159 Mass. 84, 34 N.E. 177 (1893) (Holmes, J.) and other cases, the court found that it was solely the statement of warranty in the deed that provided the basis for the estoppel. The scope of the statement in the warranty, regardless of its accuracy, controlled the extent of the estoppel. The estoppel would operate without reference to the moral qualities of either party's conduct. This has been echoed by a respected commentator speaking of estoppel by contract; "[t]he estoppel in this class of cases is fixed by the execution of the contract; nothing further need be shown. ..." M. Bigelow, A. Treatise on the Law of Estoppel 496 (6th ed. 1913). Unlike estoppel *in pais*, where an affirmative showing of good faith is required, *Goodwin v. Hartford Life Ins. Co.*,

**29.** Without estoppel by deed it would have been impossible for the *McAdams* court to have held that it was permissible to assign an expectant interest in land. This result remains

part of the law of Indiana. *Kuhn v. Kuhn*, 385 N.E.2d 1196 (Ind.App.1979) (citing favorably *McAdams v. Bailey.*)

491 F.2d 332 (3rd Cir. 1974) (applying Pa. law), all that need be shown to establish estoppel by contract is that the writing settled or, treated as settled, a fact.

The central issue remaining is whether the SLA treats a *fact* as settled. The SLA states: As you know, acting in good faith, we have entered into the [MMA] with the understanding that it is a contract for the furnishing of services by Alcoa in connection with a bailment of alumina by Essex and intend that it be so construed."

ALCOA now urges this Court that its *understanding* and *intentions* were not settled facts. While mindful of this argument, the Court considers the context in which the statements were made essential to understanding this language. ALCOA believed that the MMA was a permissible contract under the Robinson Patman Act. ALCOA desired to inhibit attacks on the legality of the MMA. One element providing a defense to a Robinson Patman suit was that the MMA was a service contract. The single purpose of the SLA was to provide a method for settling the respective rights of the parties should the MMA be found illegal or face that threat from a threshold determination of a sale of goods. In this light the language, *understanding* and *intend*, operates solely to provide a suggestion that the parties might be incorrect in determining that the MMA was a contract for the sale of services. When that is understood the statement in the SLA that the contract is one for the furnishing of services becomes an admission by ALCOA which in fairness to Essex, ALCOA may not now contradict.

Two minor points also need to be mentioned. Though the Court has found a mutual mistake in Count I with regard to the selection of the WPI, that mistake did not extend to the question of whether or not the MMA was a contract for the sale of goods. Thus the operation of estoppel by contract remains unaffected by the mistake. Finally there was no conduct by Essex to warrant an estoppel *in pais* preventing Essex from contending that ALCOA should be estopped. Essex may have referred to the APA and MMA as the purchase of aluminum in internal documents but papers exchanged by persons not versed in the distinctions between one contract for aluminum and two coordinated contracts for alumina and alumina conversion should not affect a carefully drafted multi-million dollar contract.

## COUNTERCLAIM

As previously indicated, the counterclaim of Essex is comprised of two parts. The first part contends that under the terms of the Molten Metal Agreement as implemented during the years 1977, 1978, and the first six months of 1979, ALCOA has, on numerous occasions, breached the Molten Metal Agreement by improperly failing to deliver the amounts of molten aluminum required by the contract. This aspect of the counterclaim asks that Essex be awarded damages in an amount as to fully compensate it for the failure of ALCOA to deliver molten aluminum in accordance with the terms of the Molten Metal Agreement. It is ALCOA's position with respect to this part of the counterclaim that events beyond the control of ALCOA which occurred in 1977 and 1978 were sufficient to excuse part of ALCOA's performance under Section 24 of the Molten Metal Agreement.[30]

---

**30.** Section 24 of the Molten Metal Agreement provides in pertinent part as follows:

"If the performance of this agreement by either party hereto (other than the giving of any notice required to be given by Essex or payment of monies due Alcoa from Essex under this agreement) is delayed, interrupted or prevented by reason of any breakdown of machinery, strike, labor difficulty, walkout, differences with workmen, labor shortages, accidents, fire, explosions, flood, mobiliza-

tion, war (declared or undeclared), hostilities, riots, rebellion, revolution, blockade, priorities required or requested by the federal or state government or any subdivision or agency thereof, or any other acts of any government or governments or any subdivision or agency thereof, acts of public enemies, acts of God, inability to secure or delay in securing machinery, equipment, materials, supplies, transportation, transportation facilities, fuel or power or any other cause whether or

On January 11, 1977, frigid weather conditions caused an interruption in the operation of the electrical generating plant which supplied electrical power to the ALCOA smelting plant at Warrick, Indiana. Prior to the events of January 11, 1977, the Warrick smelting plant was operating at 100% of its capacity. The frigid weather conditions caused such severe shortages of electrical power at the Warrick smelting plant that for a period of time all production of aluminum was interrupted and the entire effort of the work force was directed toward saving the entire smelting plant from going out of operation. The production level of the Warrick smelting plant was reduced by 50% and this reduction was expected to continue at this level for at least the balance of the month of January, 1977.

Pursuant to paragraph 24 of the Molten Metal Agreement, ALCOA notified Essex by letter dated January 17, that a partial interruption of smelting plant operations at ALCOA's Warrick Works occurred on January 11, 1977, and that this interruption was estimated to reduce operations for the balance of the month to approximately 50%. On January 31, 1977, an additional breakdown occurred at the power plant which supplies electrical energy to the Warrick smelter. This resulted in a further interruption of smelting plant operations. By letter dated February 1, 1977, pursuant to paragraph 24 of the Molten Metal Agreement, ALCOA notified Essex of this additional breakdown and informed Essex that it was estimated that the average level of operations through the month of February, 1977, would be at approximately 40% of capacity. ALCOA notified Essex that it would be able to supply Essex with molten metal through the month of February at about 40% of the quantity ordered by Essex.

Operating conditions improved during February, 1977. As a result of that improvement, ALCOA notified Essex by letter dated February 28, 1977, that beginning March 1, 1977, ALCOA would be able to deliver 50% of the quantity of aluminum ordered by Essex for delivery in March. By letter dated March 22, 1977, ALCOA advised Essex that beginning April 1, 1977, it would be able to deliver 67% of the quantity which Essex ordered for delivery in April. By letter dated May 9, 1977, ALCOA advised Essex that effective May 23, 1977, curtailment of deliveries would terminate. As of May 23, 1977, ALCOA resumed full deliveries to Essex.

In January, 1978, a series of events relating to electrical failure in a generator at the power plant which supplies electrical energy to the Warrick smelter resulted in a partial interruption of smelting plant operations on January 28, 1978. This generator outage was estimated to result in a reduction of smelting plant operations of approximately 8.1% from the level of operations prior to January 28, 1978. Pursuant to paragraph 24 of the Molten Metal Agreement, ALCOA notified Essex by letter dated February 6, 1978 of the partial interruption in smelting plant operations and that this interruption would require a reduction of the supply of molten metal to Essex by approximately 8.1%. The power plant which supplies electrical energy to the Warrick smelter is a coal–fired power plant. During the early months of 1978, a strike by the United Mine Workers interrupted the normal supply of fuel for that power plant and also made it impossible to purchase power from other utilities which were similarly affected by the coal strike. In addition, expiration of the labor contract with those employees working at the power plant at Warrick caused uncertainty as to the availability of power for the Warrick smelter. As a result of both the coal strike

not of the nature or character specifically enumerated above which is beyond the control of such party (a) such party shall be excused from the performance of this agreement (other than the giving of any notice required to be given by Essex or the payment of monies due Alcoa from Essex under this agreement) while and to the extent that such party is delayed, interrupted or prevented from so performing by one or more of such causes and (b) the performance of this agreement shall be resumed as soon as practicable after such disability is removed."

and the potential strike at the power plant, the reduction of 8.1% in deliveries of molten metal to Essex continued from January 28, 1978 to mid–July 1978.

Based upon the foregoing facts, this Court concludes that the events which occurred in 1977 and 1978 were beyond the control of ALCOA and sufficient to excuse part of ALCOA's performance under Section 24 of the Molten Metal Agreement.

ALCOA acted fairly and reasonably in reducing deliveries to Essex in 1977 and 1978 by the same percentage as the percentage of forced reduction from the operating level of ALCOA's Warrick smelting plant existing just prior to the occurrence of the reduction of deliveries.[31] Several factors suggest such a conclusion. First, the parties contracted for ALCOA's Warrick smelting plant to be the exclusive source of supply, thereby allowing a partial reduction in deliveries to Essex equal to the percentage of forced reduction in the operating level of the Warrick smelting plant, even though significant amounts of aluminum produced from other ALCOA smelters were in inventory at ALCOA's Warrick ingot plant and rolling mill.[32] Secondly, by its course of performance under Section 24 of the Molten Metal Agreement, Essex had previously established the principle of excusing performance by the same percentage as the percentage of forced reduction.[33] Thirdly, the burdens of a forced reduction in the operating level of ALCOA's Warrick smelting plant were shared equally between the two customers of the Warrick smelting plant (i. e., Essex and ALCOA's Warrick ingot plant). A forced reduction in the operating level of the Warrick smelter caused a reduction in deliveries to ALCOA's Warrick ingot plant from the Warrick smelting plant by the same percentage as the reduction in deliveries made to Essex. Accordingly, the first part of the Essex counterclaim will be dismissed.

The second part of the Essex counterclaim arises as a result of a letter dated June 4, 1979, in which ALCOA informed Essex that it was reducing by 15% the amount of its deliveries of molten aluminum requested by Essex. ALCOA claims to have this authority under the terms of the Molten Metal Agreement. Essex contends that ALCOA does not have any such authority and asks for an order enforcing the Molten Metal Agreement and awarding damages accordingly.

The disputed provisions of the Molten Metal Agreement in this regard are paragraphs 7a and 15. Paragraph 7a provides in pertinent part as follows:

Essex shall give Alcoa notice at least 90 days before the first day of each calendar year during the term of this agreement, except 1968, setting forth the quantity of aluminum it desires Alcoa to produce for Essex from alumina during such year .... Subject to and in accordance with the terms and conditions of this agreement, Alcoa shall deliver and Essex shall take delivery of the quantity of aluminum to be produced from alumina as specified in each notice given or deemed to be given by Essex pursuant to this paragraph 7, plus or minus 15%.

Paragraph 15 of the Molten Metal Agreement provides in pertinent part as follows:

On the first day of each calendar month during the term of this agreement. Essex shall submit a notice to Alcoa requesting delivery of a definite quantity of aluminum during the next calendar month, separately specifying the quantity to be delivered as to each block. During each calendar month of such calendar year during the term of this agreement, Alcoa shall deliver and Essex shall take delivery of approximately 1/12th of the quantity of aluminum to be produced from alumina as specified by Essex in each notice given or deemed to be given pursuant to paragraph 7 hereof for such calendar year ..., plus or minus 15%, ....

31. See U.C.C. § 2–615(b).

32. Trial transcript, pp. 2214–2218.

33. Trial transcript, pp. 2219–2222.

The meaning to be attributed to the language "plus or minus 15%" is determinative of the outcome of this portion of the Essex counterclaim.

ALCOA's position is that sections 7a and 15 of the final Molten Metal Agreement give both Essex and ALCOA a plus or minus 15% flexibility whereby Essex first specifies in its notice given to ALCOA an amount to be delivered within plus or minus 15% of the nominal amount and ALCOA may deliver within plus or minus 15% of the amount specified in Essex's notice as long as deliveries are not more than the plus 15% amount nor less than the minus 15% amount of nominals. Under this interpretation where a dispute arises as to the amount to be delivered under the Molten Metal Agreement, the two step plus or minus 15% tolerance provisions in sections 7a and 15 of the Molten Metal Agreement result in deliveries being at the nominal amount. Essex, on the other hand, contends that only it can exercise the plus or minus 15% provided for in sections 7a and 15 of the Molten Metal Agreement.

It is important initially to look at the circumstances under which sections 7a and 15 of the Molten Metal Agreement were created in determining the intention of the parties with respect to these sections. ALCOA prepared a draft of the Molten Metal Agreement dated July 18, 1967. The response of Essex to the July 18, 1967 ALCOA draft gave the plus or minus 15% tolerance to Essex alone with the Essex draft stating that the tolerance should be determined in Essex's discretion and that Essex may in its sole discretion increase the amounts of aluminum to be tolled. Upon receipt of this Essex redraft of the Molten Metal Agreement, Mr. Fisher of ALCOA indicated in September of 1967 that the plus or minus 15% tolerance provision could not be in Essex's sole discretion and that ALCOA would also need to have a plus or minus 15% tolerance on the delivery side. At an October 3, 1967 meeting between Mr. Seifert of Essex and Mr. Fisher of ALCOA, the question of whether the plus or minus 15% tolerance should be a one–way or two–way provision was again discussed, and Mr.

Fisher reiterated ALCOA's position that the 15% tolerance could not be one–way, but instead, both Essex and ALCOA each should be given a plus or minus 15% flexibility. Mr. Fisher additionally told Mr. Seifert that he, Mr. Fisher, would be sending Mr. Seifert a draft that had a two–way plus or minus 15% provision. The draft which Mr. Fisher eventually forwarded to Mr. Seifert contained language identical to that found in the final Molten Metal Agreement. The final Molten Metal Agreement deleted the language of Essex's draft making the plus or minus 15% tolerance in Essex's discretion. The history of negotiations leading up to the execution of the Molten Metal Agreement tends to indicate that the parties intended each of them to have a plus or minus 15% option.

A disturbing factor, however, is the fact that ALCOA did not immediately exercise its alleged minus 15% option as soon as it became dissatisfied with the contract price. It was not until approximately one year after institution of the instant law suit that ALCOA notified Essex that it intended to exercise its minus 15% option. From this set of facts, Essex concludes that ALCOA never really believed it had a plus or minus 15% option. The position of ALCOA is urged upon this Court to be an afterthought resulting from close scrutiny of the Molten Metal Agreement during the course of the instant litigation. Why did ALCOA suffer the loss of several million additional dollars rather than immediately exercise its minus 15% option?

Testimony at trial indicated that ALCOA chose as its strategy throughout the 1975 through 1978 period not to invoke its minus 15% tolerance because ALCOA believed such a move would be counter–productive to ALCOA's over–all goal of reaching an amicable solution with Essex on the long–range pricing problem. In 1978 ALCOA was incurring the loss of approximately 10¢ per pound on the aluminum being delivered to Essex. Unless the pricing problem were resolved, ALCOA was facing a loss of at least $75 million or more over the remaining potential life of the Molten Metal

Agreement. Under these circumstances, ALCOA chose the strategy of continuing to attempt an amicable solution to the pricing problem rather than exercising its prerogative under the plus or minus 15% tolerance. That ALCOA's failure to promptly exercise the minus 15% tolerance it allegedly possesses was not an afterthought but rather a preconceived strategy is further reinforced by the fact that ALCOA raised the minus 15% option as a defense to the counterclaim in pleadings filed in the instant litigation approximately one full year prior to the actual utilization of the minus 15% provision by ALCOA.

Considering all of the evidence, this Court concludes that ALCOA had the right to restore deliveries back to the nominal amount. Under section 15 of the Molten Metal Agreement Essex first gives a monthly notice in an amount within plus or minus 15% of the nominal amount and ALCOA may then deliver each month an amount within plus or minus 15% of the amount noticed by Essex. Accordingly, the second part of the Essex counterclaim will also be dismissed.

## CONCLUSION

This case is novel. The sums of money involved are huge. The Court has been considerably aided by the thorough and commendable work of all of the counsel who have participated in the case. There remains a need for a few concluding remarks concerning the theory of Count One of this case and its limitations.

One of the principal themes in the development of commercial contract doctrines since the 1920's has been the need for a body of law compatible with responsible commercial practices and understandings. The old spirit of the law manifest in *Parradine v. Jane, supra,* is gone. The new spirit of commercial law in Indiana and elsewhere appears in the Uniform Commercial Code, in new developments of implied covenants, and in the new Restatement.[34]

At stake in this suit is the future of a commercially important device—the long term contract. Such contracts are common in many fields of commerce. Mineral leases, building and ground leases, and long term coal sales agreements are just three examples of such contracts. If the law refused an appropriate remedy when a prudently drafted long term contract goes badly awry, the risks attending such contracts would increase. Prudent business people would avoid using this sensible business tool. Or they would needlessly suffer the delay and expense of ever more detailed and sophisticated drafting in an attempt to approximate by agreement what the law could readily furnish by general rule.

Another aspect of the new spirit of commercial law is important in this case. Much of the story of modern business law and of modern management concerns deals with the problem of risk limitation. The development of the concept of limited liability in the modern corporation illustrates this development. So do the proliferation of insurance, the development of no–fault auto insurance, and the recurring analysis of a party's capacity to anticipate losses and spread them or insure against them. *Force majeur* clauses, price indexing agreements and "double net" leases all aim to clarify and to limit the risk of long term contracts. Responsible business managers are attentive to risk control.

Corporate managers are fiduciaries. Law, founded on good sense, requires them to act with care in the management of businesses owned by other people. Attention to risk limitation is essential to the fiduciary duty of corporate managers. Courts must consider the fiduciary duty of

**34.** The essential unity of the new spirit of commercial contract law appears in the recurring adoption of new statutory principles from the Code into the body of the common law by the Restatement and by the courts. See J. Murray, Intention Over Terms: An Exploration of UCC 2–207 and New Section 60, Restatement of Contracts, 37 Fordham L.Rev. 317 (1969); J. Murray, Behaviorism Under the Uniform Commercial Code, 51 Ore.L.Rev. 269, 272 (1972); D. Murray, Under the Spreading Analogy of Article 2 of the Uniform Commercial Code, 39 Fordham L.Rev. 447 (1971).

management and the established practice of risk limitation in interpreting contracts and in the application of contract doctrines such as mistake, frustration and impracticability. Corporate managers should not gamble with corporate funds. Generally they do not. Courts should not presume that they do, nor should they frame rules founded on such a presumption. Instead, courts should be alert to indications that the parties to a commercial contract sought to limit their risks, and should interpret the contracts and frame remedies to protect that purpose.

*Parev Products Co. v. I. Rokeach & Sons, Inc., supra,* decided by Judges Clark, Frank and Learned Hand, illustrated an aspect of this point. There Parev, the plaintiff, by contract gave the defendant the exclusive right to produce and to market its product, Nyafat, a cooking oil, for fifty years for a specified royalty. The defendant had the option to cancel the contract at any time for a fee. The plaintiff agreed not to market the product or any similar product during the contract, and the defendant agreed not to market the product or any similar product after the end of the contract. In 1939 competitors began to sell Crisco and Spry, white semi–solid cooking oils which reduced the sales of the plaintiff's oil. The defendant responded to the falling sales by introducing a new product of its own, Kea, similar to Crisco and Spry. The plaintiff sued to enjoin this further competition with its product. Since the express negative covenants did not forbid this competition, the plaintiff argued that the court should imply a negative covenant to forbid it.

The court rejected the defendant's argument that only covenants intended by the parties may be implied. The court noted the then traditional "reluctance of courts to admit that they were to a considerable extent 'remaking' a contract in situations where it seemed necessary and appropriate to do so." 124 F.2d at 149. The court acknowledged that a discernible intent of the parties should control the case, but it found no sufficient indication of intent respecting this problem:

Of course, where intent though obscure, is nevertheless discernible, it must be followed; but a certain sophistication must be recognized -if we are to approach the matter frankly--where we are dealing with changed circumstances, fifteen years later, with respect to a contract which does not touch this exact point and which has at most only points of departure for more or less pressing analogies. *Id.*

Thus the question of whether to imply some sort of covenant to protect the plaintiff did not rest on the parties' intent. It rested on the status, expectations and needs of the parties to preserve the mutual benefit of the long term contract under changed circumstances.

Here defendant has a strong point in stressing the various extensive grants to it of the contract, as well as the express negative covenants which do not touch the present case. Undoubtedly extensive freedom of action was intended it. And yet that could not have been wholly unlimited, as indeed, defendant properly concedes when it admits that at least tortious competition or destruction of the Nyafat market was not open to it. And we must consider that in the period of time since the making of the contract there have been various developments which present a situation not clearly, if at all, within the contemplation of the parties at the time. Here a status exists upon which each party should be entitled to rely. What we should seek is therefore that which will most nearly preserve the status created and developed by the parties.

If we thus emphasize the situation existing today, two facts stand out. Plaintiff must clearly rely on defendant for any future benefit to be derived from its original formula; and defendant, if it is to continue to remain in the vegetable oil market, must be able to prevent the inroads of outside products, such as Crisco and Spry. So far as the plaintiff is concerned, it has long since lost its hold on its own formula. Nyafat is known to the public as a Rokeach product. Even were the defendant to release the formula,

plaintiff would have some difficulty. This is not the controlling factor, for if it were, defendant might very well terminate the contract. Instead, the sales of Nyafat continue. And yet if no covenant is found, defendant to some extent can let Nyafat slip in sales, while Kea is boosted. In other words, if the defendant does not terminate the contract, it can keep Nyafat under its control until Kea is successfully built up, and then it can safely forget Nyafat. The advantage is all to defendant. But a court of equity should grant some protection to a person who parts with his formula for exploitation. Thus, a court would hardly have permitted the defendant from the inception of this contract to lock up the plaintiff's formula in a vault and freely market Kea. There is no reason to do so now.

But defendant has an equally justifiable complaint to make. Kea, it asserts, is marketed only to compete with other products; and no attempt is made to injure Nyafat's market. Certainly we cannot say that defendant must market Nyafat, come what may, down to the sale of a mere can a year, while the vegetable oil business goes to outsiders. That would as violently alter the status of the parties as would a decree of complete freedom to defendant. It is thus clear that a strict injunction against any marketing of Kea is unjustified. Yet a complete denial of relief to the plaintiff under any circumstances would not be fair either." *Id.* at 149–150.

The court protected the "status" of both parties by implying a term requiring the defendant to compensate the plaintiff for royalties lost due to competition with the defendant's new product.

The court gave close attention to the legitimate business aims of the parties, to their purpose of avoiding the risks of great losses, and to the need to frame a remedy to preserve the essence of the agreement. To that extent the decision exemplifies the new spirit of contract law.

This attitude toward contract law and toward the work of the courts will disturb some people even at this late date. It strains against half–remembered truths and remembered half–truths from the venerated first year course in Contract Law. The core of the trouble lies in the hoary maxim that the courts will not make a contract for the parties. The maxim requires three replies. First, courts today can indeed make contracts for the parties. Given certain minimal indicators of an intent to contract, the courts are today directed to impose on the parties the necessary specific provisions to complete the process. See U.C.C. §§ 2–204, 2–207, 2–208; U.L.T.A. §§ 2–201–2–204. Second, a distinction has long been noted between judicial imposition of initial terms and judicial interpretations and implications of terms to resolve disputes concerning contracts the parties have made for themselves. The maxim bears less weight when it is applied to dispute resolution than it does when it is applied to questions of contract formation. This case is plainly one of dispute resolution. Third, the maxim rests on two sensible notions: (1) Liability under the law of contract rests on assent, not imposition. (2) Judges are seldom able business men; they seldom have the information, ability, or time to do a good job of contracting for the parties. Neither of these notions applies here. The parties have made their own contract. The Court's role here is limited to framing a remedy for a problem they did not foresee and provide for. And while the Court willingly concedes that the managements of ALCOA and Essex are better able to conduct their business than is the Court, in this dispute the Court has information from hindsight far superior to that which the parties had when they made their contract. The parties may both be better served by an informed judicial decision based on the known circumstances than by a decision wrenched from words of the contract which were not chosen with a prevision of today's circumstances. The Court gladly concedes that the parties might today evolve a better working arrangement by negotiation than the Court can impose. But they have not done so, and a rule that the Court may not act would have the perverse effect of discouraging the

parties from resolving this dispute or future disputes on their own. Only a rule which permits judicial action of the kind the Court has taken in this case will provide a desirable practical incentive for businessmen to negotiate their own resolution to problems which arise in the life of long term contracts.[35]

Finally, the Court notes that this case presents a problem of the appropriate legal response to problems of inflation. There are many long term contracts extant where inflation has upset the basic equivalence of the agreement. Courts will increasingly have to attend to problems like the present one. Bearing in mind the hazards of premature generalization, the Court would suggest that four factors considered in this decision will likely prove to be of durable importance in deciding whether to modify contracts: (1) the parties' prevision of the problems which eventually upset the balance of the agreements and their allocation of the associated risks; (2) the parties' attempts at risk limitation; (3) the existence of severe out of pocket losses and (4) the customs and expectations of the particular business community.

The problem of inflation is most frequently encountered as a change in the value of money to purchase things of all sorts. Long term fixed price contracts are most apt to be deranged by the process of inflation and are most apt to require judicial remedies. But inflation is not a coherent phenomenon. Prices of different things change at different rates. The record in this case shows clearly that the price of energy–intensive services has increased since 1973 much more rapidly than has the general Wholesale Price Index. An indexed price term in a contract may prevent or minimize the hardship of inflation, but if it fails to do so, as was true in this case, a court should look beyond the fact of the parties' prevision of the general problem of inflation and should ask if the deviation between the index and the pertinent costs

of the parties was adequately foreseen and its risk allocated in the contract. Indexing may speak more forcefully of a general purpose to limit the risks of a long term contract than of the prevision of the specific problem which the parties encounter.

The existence of severe out of pocket losses should be essential to the award of relief. Inflation will often increase the value of goods so that a seller could sell his goods for more than the stipulated contract price. This causes the seller disappointment and brings the purchaser a profit. But within a broad range this sort of market risk is assumed by parties to a long term contract. It would probably be highly disruptive to commercial relations and to transaction plans to allow parties to escape their contracts generally on this ground. Only a showing of unusual circumstance strongly suggesting the parties intended to allow the seller an excuse for performing in these circumstances should justify relief. This problem is hardly fanciful. In long term leases the landlord's principal cost is the value of the land and buildings. These are settled costs fixed before the lease or early in the leasing process. The landlord's variable costs that are subject to inflation will usually be limited to maintenance, taxes, and utilities. Many leases put some or all of these costs on the lessee. Under these circumstances the landlord may suffer little or no out of pocket loss due to inflation, but he may suffer serious disappointment if his rent receipts fall greatly behind the current rental value of his property. This sort of disappointment seems less serious and relief from it seems more destructive of contract expectations than the disappointment of serious out of pocket losses and the destruction of expectations incident to their relief.

The limitation of judicial relief to cases where the parties evidence a desire to limit their risks, where one party suffers severe out of pocket losses not adequately foreseen and provided for by the parties seems adequate to prevent a general disruption of commercial life by inflation. This limita-

---

**35.** The Court is aware of the practical incentive to negotiation which lies in the delay, expense and uncertainty of litigation. This case shows that at times these burdens are insufficient to prompt settlements.

tion also seems generally compatible with the fair needs and understanding of responsible businessmen. Little more can be asked of the courts in the development of the law.

The foregoing shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). An appropriate Order will issue.

## APPENDIX

Although the facts in this case do not require us to address the problem, the Court has studied various remedies utilized by courts in foreign countries, when beset with contracts that are no longer deemed "fair" in light of changed circumstances: that is, when it is determined that fairness requires a change in a contract because events occurring subsequent to the execution of the contract have made its performance unfair. These approaches 1) try to establish the original economic position and intent of the parties; 2) try to distribute the consequences of the unforeseen burden equally between the parties; 3) try to determine what the parties would have agreed to had they been aware of what was going to happen, and 4) order termination unless the party against whom relief is sought makes an equitable offer to modify the contract.

*Germany*: In the Federal Republic of Germany, which considers the law of the Weimar Republic to be a part of its legal system, there has been relatively extensive experience, both between and since the wars, with the problem of the approach to be taken in reforming contracts because of changed circumstances. A number of ideas have appeared. Initially, if the doctrine of reformation applies, the other party is bound to negotiate an equitable revision in view of the effects of the changed circumstances on both parties. Refusal can lead to cancellation of the contract. When a court makes the adjustment, there is some tendency to split the effects evenly between the parties. In a number of cases, the appellate court remanded with instructions to make an "equitable" adjustment.

*Switzerland*: The relevant provision of the Swiss Code of Obligations allows a court to increase the price or to rescind the contract. Two approaches have developed as to the theory of readjustment. One, called the "subjective" approach, is that "the missing regulation [provision] must be completed in such a way as the parties would have chosen had they known what was going to happen." (ATF 47 II 317–18 (1921)). The other, or "objective", approach supported by some leading commentators would more simply look to equity and good faith.

*Argentina*: In Argentina inflation has been such that most all contracts have been renegotiated. However, Argentine law does recognize the concept of "Rebus Sic Stantibus", or changed circumstances. Article 1198 of the Civil Code provides that the proper remedy is termination, except that the other party may prevent termination by offering an equitable improvement to the effects of the contract.

In contracts with the Government, price variation is allowed by law (Law 12910 and 15285). The Procurator Nacional Del Tesoro has ruled that the "economic and financial equation" of the contract is to be preserved.

*Brazil*: In Brazil, reformation of contracts is permitted due to unforeseen circumstances.

*Japan*: Disputes in Japan tend to be settled without litigation, reflecting the marked tendency of the Japanese to avoid judicial proceedings. Much emphasis is placed on the concept of trust and sincerity of the parties in dealing with and solving problems that arise in connection with contracts.

The doctrine of JIJO HENKO (changed circumstances), however, declares that the party seeking relief must request adjustment of the contract from the other party, and if the request for renegotiation is denied, the proper remedy is termination of the contract. The courts thus place great importance on the good faith effort of the parties to compromise their differences. *See* J. Toshiro Sawada, *Subsequent Conduct and Supervening Events*, pp. 132 et seq. (University of Tokyo Press 1968).

*Italy*: The Italian Civil Code (§ 1467) recognizes the concept of "Rebus Sic Stantibus" as "excessive onerousness", and provides that the proper remedy is dissolution of the contract unless the party against whom dissolution is demanded offers to modify equitably the conditions of the contract.

*Israel*: Almost no authority on the question has been found under Israeli law.

*Chile*: We have found little helpful information in Chile beyond an indication that in some cases courts have applied concepts of equity and unjust enrichment in mitigating the effects of unforeseen circumstances. Apparently, the usual practice in Chilean long–term contracts is to provide for arbitration.

*Sweden*: No cases have been found under Sweden's new law liberalizing the availability of reformation in the event of changed circumstances. Under the older, more stringent rule, the court in one case adopted the compromise offer of the party injured by the changed circumstances as an alternative to be preferred to cancellation of the contract.